1   LATHAM & WATKINS LLP
        J. Thomas Rosch (Bar No. 37668)
2       Gregory P. Lindstrom (Bar No. 82334)
        Daniel M. Wall (Bar No. 102580)
3   505 Montgomery Street, Suite 1900
    San Francisco, California  94111-2562
4   Telephone:  (415) 391-0600
    Facsimile:  (415) 395-8095
5
    ORACLE CORPORATION
6       Dorian Daley (Bar No. 129049)
        Jeffrey S. Ross (Bar No. 138172)
7   500 Oracle Parkway, 7th Floor
    Redwood Shores, California 94065
8   Telephone:  (650) 506-5200
    Facsimile:  (650) 506-7114
9
    Attorneys for Defendant
10  ORACLE CORPORATION

11              UNITED STATES DISTRICT COURT

12          FOR THE NORTHERN DISTRICT OF CALIFORNIA

13             SAN FRANCISCO JUDICIAL DISTRICT

14

15  UNITED STATES OF AMERICA, *et al.*,          CASE NO. C 04-0807 VRW

16                  Plaintiffs,                  **ORACLE CORPORATION'S PROPOSED
                                                 CONCLUSIONS OF LAW**
17          v.

18  ORACLE CORPORATION,

19                  Defendant.

20

21

22              Defendant Oracle Corporation ("Oracle") hereby proposes the following

23  Conclusions of Law:

24

25

26

27

28

# TABLE OF CONTENTS

THE STATUTE ................................................................................................................. 2

THE BURDEN OF PROOF ................................................................................................. 2

THE BURDEN OF PROVING A RELEVANT MARKET .......................................................... 2

THE PRODUCT MARKET ................................................................................................. 3

    The Proposed Relevant Markets Do Not
    Correspond to the Scope of Real-World Transactions ....................................................... 3

    The Relevant Market Includes EAS Software
    From So-Called Mid-Market Vendors, Best-of-Breed
    Vendors, Outsourcing Providers, and Incumbent Systems ................................................ 7

    "High Function HRM and FMS Software" Is Not a Distinct
    Product, and is Too Imprecise to Define a Relevant Product Market........................... 13

    Because High-Function Software is in Reality
    Defined by Customer Characteristics, it Could
    Support a Market Only if Based on Price Discrimination.............................................. 19

    Conclusion on Product Market Definition.................................................................... 22

THE GEOGRAPHIC MARKET .......................................................................................... 22

THE BURDEN OF PROVING SUBSTANTIAL LESSENING OF COMPETITION ....................... 26

UNILATERAL EFFECTS .................................................................................................. 29

ENTRY AND EXPANSION................................................................................................ 35

BUYER POWER ............................................................................................................. 38

DYNAMIC COMPETITION AND INNOVATION ................................................................. 39

HARM TO THE PEOPLESOFT INSTALLED BASE.............................................................. 41

EFFICIENCIES................................................................................................................ 43

CONCLUSION ................................................................................................................ 46

**THE STATUTE**

1.    To violate Section 7 of the Clayton Act, Oracle's acquisition of PeopleSoft must threaten "substantially to lessen competition or tend to create a monopoly" in a "line of commerce."  15 U.S.C. § 18.

**THE BURDEN OF PROOF**

2.    The Plaintiffs have the burden of proving a "reasonable probability" of substantial competitive harm; a mere possibility will not suffice.  *United States v. Marine Bancorporation, Inc*., 418 U.S. 602, 622-23 (1974); *United States v. Sungard Sys. Inc*., 172 F. Supp. 2d 172, 180 (D.D.C. 2001); *New York v. Kraft General Foods, Inc*., 926 F. Supp. 321, 358-59 (S.D.N.Y. 1995).

3.    Public policy dictates strict adherence to the burden of proof in an antitrust case challenging a merger.  The government itself has acknowledged in its *Merger Guidelines* that the "efficiency-enhancing potential" of mergers can "benefit" the economy.  Revised Section 4, Merger Guidelines, April 8, 1997.  Enjoining a merger that will not actually harm competition can therefore result in significant economic loss.  *United States v. LTV Corp*., 1984-2 Trade Cas. (CCH) ¶ 66,133 at 66,343 (D.D.C. 1984).  Thus, in this, as in other instances where significant error costs are associated with misapplication of the antitrust laws, particular care should be taken to ensure that the basis for antitrust intervention is clearly established.  *Cf. Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 594 (1986) (mistaken inferences can discourage procompetitive pricing); *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 763-65 (1984) (mistaken inferences can discourage efficient vertical communication).

**THE BURDEN OF PROVING A RELEVANT MARKET**

4.    As the "first step" in establishing a Section 7 violation, the government has the burden of properly defining the relevant market.  *FTC v. Tenet Health Care Corp*., 186 F.3d 1045, 1051-52 (8th Cir. 1999); *Sungard*, 172 F. Supp. 2d at 181; *California v. Sutter Health Sys*., 84 F. Supp. 2d 1057, 1066 (N.D. Cal. 2000), *aff'd* mem., 217 F.3d 846 (9th Cir. 2000).

LATHAM&WATKINS⊔ᴸᴾ

5.      The relevant market has both geographic and product dimensions.  *Brown Shoe Co. v. United States,* 370 U.S. 294, 324-28 (1962).  The relevant market must be "well-defined" in both respects.  *Tenet*, 186 F.3d at 1052.  This means that the government must define the market with sufficient specificity that it can be determined "who is in and who is out of the market," *In re Midcon Corp.*, 112 F.T.C. 93, 141 (1989), and which sales are relevant to calculating marketing shares.  *United States v. Eastman Kodak Co.*, 63 F.3d 95, 102-106 (2d Cir. 1995); *see also United States v. General Dynamics Corp.*, 415 U.S. 486, 494-504 (1974).  Otherwise, competitive effects cannot be confidently predicted.  *Midcon*, 112 F.T.C. at 141; *United States v. Baker Hughes, Inc.*, 731 F. Supp 3, 7 (D.D.C. 1980) ("'[t]he relevant market proposed by the [government] is too amorphous to be subjected to the hard economic analysis required by § 7.'") *aff'd.* 908 F.2d 981 (D.C. Cir. 1990) (quoting *Carter Hawley Hale Stores v. Limited Inc.*, 587 F. Supp. 246, 253 (C.D. Cal. 1984)).

**THE PRODUCT MARKET**

6.      The government claims that the relevant product markets consist of "high function" HRM and FMS software.  Complaint ¶ 23.  For each of the following reasons, any one of which would be sufficient, the Court rejects the Plaintiffs' contention that "high-function" FMS and HRM software constitute relevant product markets.

**The Proposed Relevant Markets Do Not Correspond to the Scope of Real-World Transactions.**

7.      Market definition begins with an understanding of the products of the merging firms, *i.e.*, what they sell in commerce.  Merger Guidelines ¶ 1.11.  The next steps in the analysis, identifying and assessing current and potential demand and supply responses that constrain competitive behavior, require a clear understanding of market realities – the products and transactions that comprise the interactions between buyers and sellers.

8.      Plaintiffs' alleged relevant product markets are limited to FMS and HRM software only, and only to "core" FMS and HRM software.  More specifically, Plaintiffs propose to include in the markets only General Ledger, Accounts Payable, Accounts Receivable and Asset Management software in the case of FMS, and only Employee Record, Benefits and

LATHAM&WATKINS™

Payroll software in the case of HRM.  Plaintiffs propose that suites of these most basic software programs in the HR and Financial Management "pillars" are the relevant products.

9.      Plaintiffs thus propose "cluster markets."  *See*, *e.g.*, *United States v. Grinnell Corp.*, 384 U.S. 563, 572 (1966) (fire and burglary protection were part of a "cluster" of services generally sold and bought together – "accredited central station [alarm] services"); *United States v. Central State Bank*, 621 F. Supp. 1276, 1291-92 (W.D. Mich. 1985) (rejecting proposed relevant markets of transactional accounts and small loans where those were components of the cluster of banking services sold by the merging parties).  There is nothing wrong with this in concept, but a foundational problem with Plaintiffs' approach is that the proposed clusters – core HRM and/or FMS – rarely correspond to what is actually bought and sold in commerce.  That is, very few transactions are just for core HRM and/or FMS.  To the contrary, the great majority of the EAS transactions documented in the record are much broader deals involving, often predominantly, software modules or types outside the confines of the alleged relevant product market.  These may be "non-core" FMS and HRM modules, other types of EAS software such as SCM or CRM, applications servers and other middleware, and in Oracle's case, database software.  Indeed, the sample of Oracle discount request forms used by the government's experts for their analyses showed that broader clusters were involved in almost every case.

10.     Importantly, there is no evidence (nor really any claim) that Oracle or other EAS vendors separately price the core FMS and HRM components of a deal in order to account for the supposed "oligopoly" characteristics of the putative relevant markets.  Rather, the evidence indicates the entire bundle of software represented by any deal, whatever its composition, is generally priced as a whole with a so-called "blended discount."  Oracle's chief economic expert likened this to "salad bar" pricing, in which whatever combination of items a customer selects is weighed and priced as a single product.  (Trial Transcript (hereinafter "Tr.") 3813:23-3814:2 (J. Hausman)).  Indeed, in one notable example (because it was selected by Plaintiffs' expert, Professor Elzinga, as typical), the core HR modules were nominally free (discounted 100%).  (Tr. 2398-2399 (K. Elzinga)).

LATHAM&WATKINS<sub>LLP</sub>

11.     The general prevalence of large, multi-product bundles in the transactions at issue makes it impossible to analyze competition by reference to the Plaintiffs' concept of core FMS and HRM.  Plaintiffs' own economic analysis demonstrates that in many transactions that Plaintiffs deem typical, there are  many competing vendors, including point solution providers, CRM vendors, SCM vendors, middleware vendors and database software vendors.  Sometimes these other vendors compete for only a piece of a deal, sometimes teams of vendors compete for the whole.  Regardless, all such firms influence and constrain the pricing of the suite vendors because, as noted, the pricing of the suite vendors tends not to distinguish between the particular types of EAS software in the bundles they sell.  Furthermore, Plaintiffs do not deny that Oracle faces vigorous competition for the sale of EAS products other than core FMS and HRM, for its database software and for the various services it sells.

12.     The record shows that Oracle understands that if it were to try to charge supra-competitive prices for its core HRM or FMS software, it would be at risk of losing immediate and future sales of those other products and services.  Furthermore, the record shows that the lost profits resulting from such lost sales would be substantial because Oracle's marginal costs are so low.  As a matter of law, that requires either expanding the market to include the broader bundle and the competitors therefor, or factoring in such competition in the analysis of whether Oracle could exercise unilateral market power.  *See Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 469 n.15 (1992) (considering argument that systems competition would discipline pricing of allegedly monopolized components:  "Whether considered in the conceptual category of 'market definition' or 'market power,' the ultimate inquiry is the same – whether competition in the equipment market will significantly restrain power in the service and parts market.").  In no event can these real-world competitive forces be ignored.  Antitrust law presumes that firms act in their self-interest.  *Adaptive Power Solutions, LLC v. Hughes Missile Sys. Co.*, 141 F.3d 947, 952-53 (9th Cir. 1998).  Here, that requires the Court to assume that EAS vendors are constrained by all the competition they face as they try to capture as much of the customer's business as possible.

ORACLE  CORPORATION'S
PROPOSED CONCLUSIONS OF LAW
CASE NO. C 04-807 VRW

LATHAM&WATKINS LLP

13.     Plaintiffs have frequently invoked the example of a beer and wine distributor that has a local monopoly in beer distribution.  Such a distributor, Plaintiffs claim, would charge supracompetitive prices for beer even if it faced competition in wine.  (Tr. 2402:13-2403:4 (Elzinga)).  The analogy fails because EAS vendors tend not to distinguish (or discriminate, if you will) between different kinds of software when setting prices.  Rather, they tend to sell and discount the entire bundle they are offering as if it were a single product.  Indeed, the Oracle "HQApps" discount approval forms about which Plaintiffs make so much do not indicate the proportion of software in any deal that comes from particular pillars or is "core."  This practice cannot be reconciled with Plaintiffs' argument that the relevant markets are differentiated oligopolies, in which case one would expect Oracle to monitor carefully opportunities to engage in oligopoly pricing.

14.     It must also be noted that if there were "markets" for the sale to very large (multi-billion dollar) corporations of core HRM and FMS, they would be extremely small, reflecting the minor part these modules play in typical market transactions.  Oracle's Co-President, Safra Catz, testified that when Oracle attempted to identify sales to companies on a Department of Justice-provided "proxy list" of large, global enterprises whose purchases included some HRM or FMS software, it was able to identify only sixteen such transactions over a nine-month period in 2003, collectively accounting for less than $18 million of total EAS revenues, and only $2 million in FMS and HRM revenues.  (Tr. 3454:7-3456:16 (S. Catz)).  It thus appears that Plaintiffs' efforts to identify "markets" in which allegations of high concentration seem facially plausible has resulted in a case focused on a tiny slice of the multi-billion dollar EAS industry.

15.     In any event, it is Plaintiffs' burden, not Oracle's nor the Court's, to define the relevant markets.  This first reason Plaintiffs have failed to do so is that they have not correctly identified, described and accounted for the scope of the transactions in which core FMS or HRM software is actually sold.

6

LATHAM&WATKINS LLP

**The Relevant Market Includes EAS Software from So-Called Mid-Market Vendors, Best-of-Breed Vendors, Outsourcing Providers, and Incumbent Systems.**

16.     The government has alleged that the only vendors of "high function" HRM and FMS are Oracle, SAP and/or PeopleSoft.  Complaint ¶¶ 9, 31.  This effectively limits the pleaded relevant product market to the HRM and FMS of those three vendors (or, for some customers who are not identified, to the products of Oracle and PeopleSoft alone).  However, as a matter of law, the relevant product market must include "all alternatives to which customers could practicably turn …. should the merger be consummated and prices become anticompetitive." *Tenet*, 186 F.3d at 1052; *see also FTC v. Freeman Hosp*., 69 F.3d 260, 269 (8th Cir. 1995).  Those alternatives must include all products that reasonably could satisfy a customer's needs, not just the alternatives that a given customer may prefer.  *Donnelley*, 120 F.T.C. at 129 n.65; Robert Pitofsky, *New Definitions of the Relevant Market and the Assault on Antitrust*, 90 Colum. L. Rev. 1805, 1806 (1990).  More specifically, the relevant product market must include the products of all vendors "who have the 'actual or potential' ability to deprive each other of significant levels of business."  *Rebel Oil Co. v. Atl. Richfield Co*., 51 F.3d 1421, 1434 (9th Cir. 1995); *Thurman Ind. v. Pay N' Pak Stores, Inc*., 875 F.2d 1369, 1374 (9th Cir. 1989).  The Court finds that these principles mandate the inclusion in the relevant markets of what Plaintiffs pejoratively call "mid-market vendors," plus best-of-breed vendors, outsourcing providers, and incumbent systems.[1]

17.     As a preliminary matter, it is important to note that the relevant question from an antitrust perspective is not whether there are other firms that could equal SAP, Oracle or PeopleSoft in terms of scale and scope of product offerings.  These three firms are clearly the largest and most ubiquitous EAS vendors in the world, competing in more geographies and industries than others.  In general, other vendors are more specialized, concentrating on parts of

---

[1]     For convenience, the Court will adopt the convention of referring to EAS vendors other than SAP, Oracle and PeopleSoft as "mid-market" vendors.  This should not be taken to imply agreement with Plaintiffs' argument that such vendors do not compete with SAP, Oracle and PeopleSoft for large enterprise business.

LATHAM&WATKINS LLP

the relevant markets.  Ubiquity, however, is not the test for competitiveness.  The question in a merger analysis is whether other firms offering competitive products and services could, individually or collectively, constrain post-merger behavior by depriving Oracle of sufficient business to make a post-merger price increase unprofitable.  This typically occurs because "marginal customers," the most elastic, defect to other rivals, and it often takes only a relatively small fraction of the total customer base to defect before a price increase would be unprofitable.  *See Tenet*, 186 F.3d at 1053 (describing "critical loss" analysis); *United States v. Engelhard Corp.,* 126 F.3d 1302, 1306 (11th Cir. 1997) ("If a sufficient number of customers switch to alternative products, then the hypothetical … price increase can become unprofitable. Furthermore, it is possible for only a few customers who switch to alternatives to make the price increase unprofitable, thereby protecting a larger number of customers who would have acquiesced in higher … prices.").  The question, therefore, is whether Plaintiffs' proposed market of the three largest EAS vendors stands up to the scrutiny of rigorous antitrust analysis. If it does not, it makes no difference that in a non-antitrust sense these three vendors constitute some "Tier 1" grouping.

18.   Plaintiffs' experts have done nothing to address the market definition issues in this case with economic rigor.  In particular, they have done nothing to study systematically or quantitatively the potential loss of marginal customers to mid-market vendors, best-of-breed vendors, or outsourcing providers should a hypothetical cartel of SAP, Oracle and PeopleSoft raise prices.  (Tr. 2291:5-16 (Elzinga)).  They have at least implicitly assumed, and in Professor Iansiti's case explicitly asserted, that a vendor must be able to meet "high-function needs" "consistently" to be included in the market.  (Tr. 2084:14-16 (Iansiti) (arguing there are "no additional software vendors capable of consistently meeting enterprise HR and FMS requirements").  This is the wrong standard.  If so-called mid-market vendors, best-of-breed vendors, or outsourcing providers (individually or collectively) can deprive Oracle of enough business to render a post-merger price increase unprofitable, their products must be included in the relevant market. *Thurman Indus*., 875 F.2d at 1374; *Rebel Oil*, 51 F.3d at 1434.

LATHAM&WATKINS LLP

19.     The evidence at trial demonstrates that so-called mid-market vendors have the actual and potential ability to deprive the larger vendors of substantial levels of business, even at current market prices and in the case of large enterprise customers.

20.     First, numerous vendors other than SAP, Oracle and PeopleSoft have core FMS and HRM products.  Microsoft (with its Axapta product), Lawson, AMS, GEAC, SSA Baan, and ADP are among the additional vendors with core HRM and/or FMS products.  Dozens of examples were provided at trial of actual wins by these vendors and others for the HRM or FMS business of large and complex enterprises, and many more appearances in the final rounds of EAS procurements.  At the very least this evidence required Plaintiffs to demonstrate that the amount of business at risk to mid-market vendors was too small to discipline a post-merger price increase by "high-function" vendors.  Plaintiffs failed to carry that burden, attempting instead to marginalize the mid-market vendors' wins qualitatively, on the grounds they were only serving large customers that, because they employed decentralized EAS strategies, were not complex. No evidence supported this argument.  Whether to adopt a centralized EAS system (in which case SAP, Oracle and PeopleSoft products arguably become more attractive) or a decentralized set of solutions is simply a choice that customers make in light of competitive options.  A market cannot be defined solely around the products that best meet the needs of those who pursue one of the available product options.  *See Engelhard,* 126 F.3d at 1306 (discussed below).

21.     In fact, the primary difference between the "high-function" and "mid-market" vendors evident at trial was vertical specialization.  Smaller vendors such as Lawson, AMS and SCT tend to concentrate on particular verticals where they can build differentiating industry expertise.  Lawson, for example, has become a very strong vendor in the Healthcare vertical (among others), serving seven of the top ten healthcare providers in the United States. AMS specializes in solutions for the public sector.  SCT concentrates on the education vertical. J.D. Edwards, before it was acquired by PeopleSoft, concentrated in manufacturing industries. The conclusion to be drawn from this is not that these vendors are noncompetitive with the larger vendors, but simply that the particular "mid-market" vendors most competitive today for large enterprise business varies from vertical to vertical, and perhaps customer to customer.  Because

9

LATHAM&WATKINS LLP

1   they constrain EAS vendor behavior, however, these so-called mid-market vendors must be

2   included in the relevant market.

3          22.     Best-of-breed and point solution providers also have the actual and

4   potential ability to deprive SAP, Oracle and PeopleSoft of substantial levels of business, and for

5   that reason must also be included in the relevant market.  It may be true that few customers

6   would separately procure the "core" elements of their HRM and FMS solutions from multiple

7   vendors.  That argument, however, is a straw man that does not address the importance of best-

8   of-breed providers to this analysis.  Best-of-breed providers have the actual and potential ability

9   to deprive SAP, Oracle and PeopleSoft of substantial levels of business because the typical

10  procurement for FMS and HRM solutions calls for important elements beyond the "core"

11  functionalities, elements that can be and often are addressed by point solutions.  To avoid losing

12  these elements to point solution providers, the suite vendors typically discount the entire bundle

13  of software they are offering.  In other words, the potential loss of any element of an EAS bundle

14  affects the price of the bundle as a whole.  This is another factor that Plaintiffs' experts never

15  studied in any systematic or quantitative manner.

16         23.     The evidence at trial also demonstrates that HR outsourcing providers

17  have the actual and potential ability to deprive SAP, Oracle and PeopleSoft of substantial levels

18  of business, even at current market prices and in the case of large enterprise customers.

19  Outsourcing comes in various forms, from the traditional payroll outsourcing dominated by ADP

20  to the modern "Business Process Outsourcing" in which nearly all of a corporation's HR

21  function is provided by a third party.  Again, the record contains numerous examples of HR

22  outsourcers winning HR business from "in-sourcers" such as SAP, Oracle and PeopleSoft.  This

23  at least required Plaintiffs to demonstrate that the potential loss of HRM business was too

24  insubstantial to discipline a post-merger price increase.  Plaintiffs failed to meet that burden.  To

25  the contrary, the evidence indicates that business process outsourcing, at least in the HR arena, is

26  growing in popularity and becoming increasingly competitive with packaged software

27  alternatives.  Plaintiffs' witness from Verizon testified that Verizon constantly evaluates

28  outsourcing options.  (Tr. 604:15-21 (L. Bradley)).

24.     Plaintiffs' efforts to marginalize outsourcing are rejected.  First, the Court rejects both factually and legally Plaintiffs' claim that outsourcers rarely show up in EAS procurements, but rather obviate the need for such a procurement when they convince an enterprise to outsource the business process.  In fact, Fidelity's Mr. Sternklar indicated that Fidelity competes head-to-head with packaged software vendors in formal procurements approximately as often as it does outside formal procurements.

25.     As a legal matter, Plaintiffs' argument makes the same fundamental mistake the Antitrust Division made in *Engelhard,* 126 F.3d at 1306-07.  There the Division challenged a proposed merger between parties who collectively accounted for 80% of the sales of GQA, one of several thickening and suspension agents used in a variety of industrial products. The government alleged a GQA-only market based on testimony by GQA users that a 5-10% price increase would not induce them to move to non-GQA thickeners.  This is similar to Plaintiffs' reliance on testimony that existing packaged software users would not switch to outsourcing on account of a 5-10% price increase.  However, both the district court and the Eleventh Circuit rejected the argument because it ignored the alternative thickening agents that were available at the "pre-formulation stage," meaning before a customer committed to GQA. The court explained that although the demand by those who had already selected GQA for their formulations might not be "immediately responsive to changes in the prices of GQA or other industrial thickeners, GQA competes with other thickeners when products are being formulated" and "[o]ver the long run, this pre-formulation competition may protect current GQA users from the exercise of market power." *Id.* at 1307.  Likewise, even if it were the case that those who commit to undertake a formal HRM procurement do not very often consider outsourcing as part of that procurement, the fact that they can and do consider outsourcing outside the parameters of the procurement – at the pre-procurement stage, if you will – requires the inclusion of outsourcing providers in the relevant market.

26.     The Court also rejects on both factual and legal grounds Plaintiffs' argument that HR outsourcers are simply resellers of SAP, Oracle and PeopleSoft software. First, this is simply not true for all outsourcers, including two of the largest, ADP and Fidelity.

LATHAM&WATKINS LLP

ADP's HR outsourcing offering is based on a combination of its own HR software ("Enterprise HR") and its own payroll outsourcing engines.  Fidelity uses some Oracle software, but has acquired IBM's HR Access software and is moving toward software independence. Furthermore, the license costs HR outsourcers incur when they do use SAP, Oracle or PeopleSoft software are 1-2 percent of the overall costs of providing the outsourcing solution.  (Tr. 3135:3-11 (M. Sternklar)).  There is no evidence that the license agreements between SAP, Oracle or PeopleSoft and the outsourcers that use their software constrain the competitiveness of the outsourcers or in any sense control their output.  Finally, given the impossibility of SAP, Oracle or PeopleSoft imposing differential pricing on outsourcers in accordance with the characteristics of the *outsourcers'* customers – the outsourcing analogue of price discrimination – even if Oracle, PeopleSoft and SAP *were* regarded simply as resellers of the products of Oracle, PeopleSoft and SAP, their presence in the market ensures that software vendors cannot effectively price discriminate against any of the growing class of customers for whom outsourcing is a realistic option.

27.     Incumbent systems also provide real competition to "new" EAS systems. Court have recognized previously that it may be appropriate to include in the relevant product market the existing systems used by prospective buyers.  This was done in *Sungard,* where internal disaster recovery systems (called "internal hotsites") were an alternative to the "Business Continuity/Disaster Recovery" systems alleged to constitute the relevant market.  172 F. Supp. 2d at 186-90.  Citing evidence that internal systems were perceived by external hotsite vendors to be genuine competition, the Court found internal hotsites part of the relevant market.  *Id.*

28.     In this case, virtually all large and complex organizations that could purchase core FMS or HRM software from a packaged software vendor have either done so or chosen not to do so in favor of a home-grown or legacy system.  Consequently, sellers of core FMS or HRM software, to the extent they focus on large enterprises, face a replacement market primarily.  (Tr. 3111:2-10 (D. Burgum)).  In this setting, most prospective buyers have a credible "do nothing" option – an industry term for the alternative to remain with one's existing system, appropriately upgraded, instead of acquiring a new system.  This is not literally "doing nothing,"

as there are costs of remaining on maintenance or upgrading one's own system. In many cases, however, these costs are a fraction of those incurred to acquire and implement a new system. Potential EAS customers regularly evaluate the option of staying with an incumbent system and in that sense doing nothing. Indeed, a sizable percentage of potential buyers that actually conduct formal EAS procurements nevertheless decide to "do nothing."

29.     The evidence clearly demonstrates that the "do nothing option" constrains the pricing of new EAS systems. DaimlerChrysler, for example, was able to obtain competitive prices from PeopleSoft simply by threatening to "do nothing" if an acceptable price was not obtained. (Tr. 1412:4-13 (M. Gorriz)). CH2M Hill did the same. (Tr. 208:6-16 (R. Bullock)). Numerous discount approval forms also list legacy systems or "do nothing" as the justification for a requested discount. Indeed, the government's expert, Professor McAfee, opined that incumbent systems needed to be accounted for in determining market shares. (Tr. 2569:13-25 (R. McAfee)). Under these circumstances, as in *Sungard*, it is not appropriate to exclude incumbent systems from the relevant markets.

30.     In short, there are numerous product and service alternatives that compete with SAP, Oracle and PeopleSoft EAS offerings.

**"High-Function HRM and FMS Software" Is Not a Distinct Product, and is Too Imprecise to Define a Relevant Product Market.**

31.     As noted, Plaintiffs contend that the relevant markets in which to assess this transaction are "high-function" HRM and FMS software. In fact, it is this concept and this concept only that permits Plaintiffs to attempt to exclude from the relevant markets the various product and service options just discussed. Plaintiffs' argument, repeated whenever another piece of evidence showed a large and complex enterprise solving its HR or financial management automation needs with a product or service other than SAP, Oracle or PeopleSoft packaged software, was that such customer could not have had "high-function needs." The argument seems like semantics on its face, and in fact it is. The Court finds the high-function concept insufficiently meaningful or fixed to support a market definition. While Plaintiffs may

LATHAM&WATKINS LLP

be correct that they need not define a market with perfect precision, the "high-function" concept as articulated by Plaintiffs falls well below the required degree of specificity.

32.     "High-function software" is a term coined by Plaintiffs as "shorthand" to "describe the phenomenon that . . . different customers have different requirements."  (Tr. 30:23-31:3 (C. Scott)).  The term has no independent or industry-standard meaning (Tr. 349:7-10 (R. Bergquist), 2298:6-20 (K. Elzinga)), and the evidence offers no clear guidance on the aspects or dimensions of "high-function software" or the level of quality that would qualify EAS software as "high-function software."  (*Compare* Tr. 394:17-395:12 (R. Bergquist), *with* 1612:3-7 (C. Bass) *and* 2089:14-21 (M. Iansiti)).

33.     Plaintiffs have attempted to define "high-function software" at various stages in this litigation, including in the Complaint and in response to the Court's Order of June 25, 2004.  The government's Complaint defined "high function" HRM and FMS in a vague and even circular manner, as when the government alleged that "high function" HRM and FMS have "performance characteristics that meet the demands of multi-faceted organizations with higher level functional needs."  Complaint ¶ 23.  A "multi-faceted organization with higher level functional needs" was elsewhere defined as a "large corporation [that] may require a multimillion dollar software solution that is configured to the organization's needs and can perform these important functions seamlessly and simultaneously across multiple divisions or subsidiaries, multiple lines of business, and multiple legal jurisdictions."  Complaint ¶ 9.  Such "large" organizations were distinguished in the Complaint from "mid-market" organizations, which the government alleged did not need "high function" HRM or FMS.  Complaint ¶ 11.

34.     In response to the Court's Order of June 25, Plaintiffs stated that "high-function software" is their own term for "a category of software products that industry participants call 'enterprise' software, 'up-market' software, or 'Tier One' software."  They further stated that "high-function software" is distinguished from "mid-market" software sold by firms other than SAP, Oracle and PeopleSoft.  Plaintiffs contended in this pleading that "high-function" software has "advanced performance capabilities" not found in other EAS software, such as high scalability, high configurability, tight integration, and international capabilities.

LATHAM&WATKINSLLP

However, none of these factors is alleged to be truly definitional.  Plaintiffs have consistently argued that these kinds of capabilities are merely indicative of "high-function" software, always leaving themselves the option to claim that a given customer needs or does not need "high-function" software in its peculiar circumstances.

35.     Nevertheless, Plaintiffs and their experts contended at trial that the putative markets are "traditional" product markets based on product characteristics that only SAP, Oracle and PeopleSoft EAS products have.  Plaintiffs contend, in other words, that "high-function" software is a different physical product than so-called mid-market software, and therefore that EAS vendors sell different software to "high-function" and "mid-market" customers.  This is clearly incorrect.  Oracle, PeopleSoft and SAP in fact sell the same software to both enterprise and mid-market customers, at least down to the $200-300 million annual revenue customer, at which point they may sell pre-configured versions of their products or even separate code to smaller customers.  This unquestionably puts the relevant Oracle, PeopleSoft and SAP EAS products in frequent competition with EAS products from Lawson, Microsoft, Baan, ADP, AMS, and other vendors Plaintiffs relegate to the mid-market.

36.     In fact, the primary product distinction between Oracle, PeopleSoft and SAP solutions, on the one hand, and what the government calls mid-market solutions, on the other hand, is the breadth of the product offering:  Oracle, PeopleSoft and SAP have the broadest EAS catalogues, with the most "pillars" covered, the most languages supported, the most localizations, the most vertical solutions, and so forth.  Of course, no enterprise, irrespective of size and global reach, buys the full catalogue; like smaller companies, a large company will only buy the parts it wants or needs.  Furthermore, the great majority of the differences that distinguish the large vendors' catalogues are outside "core" HRM and FMS, which in fact is quite standardized on account of legal and accounting requirements.  In any case, every part of the SAP, Oracle and PeopleSoft catalogues is offered and sold both to enterprise and mid-market customers.  Every part of those catalogues comes into competition with what the government calls mid-market EAS.

LATHAM&WATKINS LLP

37.     There are, to be sure, some very large enterprises operating in multiple countries and industries whose EAS requirements are so extensive that, should they choose to standardize on a single EAS vendor, they would exhaust the less-extensive catalogues of some vendors.  Such firms might be differentially attracted to Oracle, PeopleSoft and SAP software.  (*See* Tr. 868:3-6 (P. Keating) ("The bigger the company, the more currencies, the more countries, the more legal entities, the more languages, the more Oracle, SAP, and PeopleSoft meet those requirements.")).  This phenomenon, however, is properly viewed as a manifestation of *buyer* characteristics – a more extensive shopping list, if you will – that, at most, present the possibility of price discrimination markets.  It does not detract from the fact that EAS vendors sell the same software to both the huge and the merely large enterprises, and that the same software is therefore in regular competition with products from Lawson, AMS, ADP and so on.

38.     The factors that make the products of SAP, Oracle and PeopleSoft attractive to very large enterprises do not differentiate them from so-called mid-market software to the degree required to support a separate "high-function" market.  To the contrary, this case presents the familiar "continuum problem" where differentiated products fall along a spectrum of capabilities or "quality."  *See* ABA Antitrust Section, *MERGERS AND ACQUISITIONS: UNDERSTANDING THE ANTITRUST ISSUES* 51-54 (2d Ed. 2000).  In such a case, there must be a clear break in the chain of substitutes in order for separate markets to be found.  *See, e.g.*, *Liggett & Myers, Inc. v. FTC,* 567 F.2d 1273, 1274-75 (4th Cir. 1977) (rejecting distinctions between classes of dog food); *New York v. Kraft Foods, Inc.*, 926 F. Supp. 321, 333 (S.D.N.Y. 1995) (differentiated breakfast cereals in same market); *In re Super Premium Ice Cream Distribution Antitrust Litig.*, 691 F. Supp. 1262 (N.D. Cal. 1988), *aff'd without op. sub nom. Haagen-Dazs Co. v. Double Rainbow Gourmet Ice Creams, Inc.,* 895 F.2d 1417 (9th Cir. 1990) (product quality distinctions "are economically meaningless where the differences are actually a spectrum of price and quality differences").[2]  Here, there is no clear break in the chain of substitutes, as

---

[2]     The potential exception to this rule is where one can show price discrimination against customers that uniquely value products on one end of the spectrum.  This is discussed below.

LATHAM&WATKINS LLP

there is abundant evidence that allegedly less-functional software from the likes of Lawson, AMS, Baan, ADP and Microsoft is competitive with SAP, Oracle and PeopleSoft software for large customers with "high-function" needs.  That is true whether such software is considered on a standalone basis or, as EAS is often considered, in conjunction with other commercially available or internally-developed software that "fills out" a vendor's proposed solution.

39.      Plaintiffs' inability to define the "enterprise" market or "up-market" with any consistency or precision also undermines the notion of a distinct "high-function" market. There is no discernable dividing line between the "mid-market" and the "up-market," and no two witnesses at trial applied the same standard to distinguish these "markets."  Proxies based on customer size do not suffice; Plaintiffs' own witnesses used enterprise revenue proxies ranging from $500 million to $2 billion in annual revenues, a large enough variation to include or exclude thousands of large companies depending on where the line is drawn.  Numerous very large companies such as Johnson & Johnson and Safeway use what Plaintiffs call mid-market software, a fact that further undermines the utility of the "high-function" concept.  Indeed, in its opening statement the government conceded that "it is not enough to look at customer size" in order to define enterprises with high-function needs.

40.      The record establishes that "high function" software cannot be defined by any uniform set of customer needs either.  In response to the Court's request for a definition of the term "high function," the government described the following attributes: (1) the software must be so "scalable" that it "can process and track virtually unlimited transactions across companies"; (2) the software must be so "highly configurable" that it can "enable unlimited levels of organizations"; (3) the software must perform related transactions so "seamlessly" that no "customized codes" are required; and (4) the software must have "the capability to handle international aspects of business such as multiple currencies, multiple languages and multiple legal requirements" and indeed must be able to support 30 languages.  7/1/04 Stipulation Re. Definitions.  However, the government admits that "not all" of these attributes are needed by the "multi-faceted" organizations to which the Complaint refers in defining the relevant market.

LATHAM&WATKINS␣␣␣

41.     Plaintiffs' admission is amply borne out by the record.  It shows that most of the customers whose representatives were called as witnesses by the government – i.e. Nextel, Verizon, AIMCO, MetroNorth, Greyhound, Neiman Marcus, North Dakota – were not multi-national organizations and hence had no need at all for HRM or FMS that would support multiple languages or currencies; and that a number of those customers – i.e. AIMCO, MetroNorth, Neiman Marcus – do not have multiple divisions and hence have no need for software that can "enable unlimited levels of organizations."  Indeed, none of the customer witnesses testified to a need for software that would support "virtually unlimited transactions" or "unlimited levels of organizations"; all of them testified to the need to use at least some customized code to knit together their HRM and FMS systems with other software systems; and in fact none of the vendor or systems integrator witnesses testified that the HRM or FMS products of either Oracle or PeopleSoft could meet all of the demanding requirements that Plaintiffs describe as the defining attributes of "high function" HRM and FMS.

42.     A particularly telling description of the distinction between the alleged "enterprise" and "mid-market" segments was by Plaintiffs' witness Richard Allen, who eschewed all general metrics in favor of a customer-by-customer determination of "needs" and buying behavior.  This testimony undermines the proposed market by all but admitting that one can only "know it when you see it" on a procurement-by-procurement basis.  An antitrust market cannot be so ephemeral, lasting only so long as a particular procurement is underway and ceasing to have significance as soon as another customer that defines its "needs" differently comes along.  Such a market "'is too amorphous to be subjected to the hard economic analysis required by § 7.'"  *United States v. Baker Hughes, Inc.*, 731 F. Supp. 3, 7 (D.D.C. 1990), *aff'd*, 908 F.2d 981 (D.C. Cir. 1990) (quoting *Carter Hawley Hale Stores v. Limited, Inc.*, 587 F. Supp. 246, 253 (C.D. Cal. 1984)).

43.     The inability of Plaintiffs' experts to utilize the high-function concept in their economic analysis also demonstrates the deficiencies of the putative market definitions.  None of the "quantitative" analyses conducted by Plaintiffs' experts separated market transactions into sales of high-function and other EAS software based on the allegedly

identifying criteria of scalability, configurability, tight integration, and international capabilities. For example, in analyzing market shares and concentration in the "high function" HRM and FMS "markets," Professor Elzinga used the numerical size of the transaction (greater than $500,000) – not the functionality of the software sold or the complexity of the customer's needs – as the basis for his analysis. In analyzing direct competition between Oracle and PeopleSoft, as well as in constructing his "econometric" study of pricing, Professor McAfee likewise used the size of the deal, instead of the functionality of the software or the complexity of the customer's needs, to differentiate sales of "high function" software from other software. If Plaintiffs' own experts cannot use the high-function concept in their own analyses, there is no basis for asserting that the Court can use it in its analysis. The conclusion becomes inescapable that the high-function concept lacks the specificity needed to determine "who is in and who is out of the market," *In re Midcon Corp*., 112 F.T.C. 93, 141 (1989), and to predict competitive effects with confidence. *Id.*; *Baker Hughes*, 731 F. Supp. at 7.

**Because High-Function Software is in Reality Defined by Customer Characteristics, it Could Support A Market Only if Based on Price Discrimination.**

44.     In its Complaint the government alleges that "[t]he price of the software is set based on the circumstances presented by each transaction, and vendors can price discriminate against individual customers." Complaint ¶ 25. Thus the government pleaded price discrimination markets. The government also stated, in response to Interrogatories seeking clarification of its contentions, that it was claiming that the "long, iterative procurement process" which "large" and "multifaceted" organizations employ "permits price discrimination" against them. Plaintiffs' Response to Interrogatory No. 26. As noted, however, in their Trial Brief Plaintiffs backtracked. They contended the putative markets are "traditional" product markets based on product characteristics. They denied that the putative markets are "price discrimination" markets based on customer characteristics that cause buyers to "differ significantly in their likelihood of switching to other products in response to a 'small but significant and nontransitory' price increase." *Merger Guidelines* ¶ 1.12 ("Product Market Definition in the Presence of Price Discrimination"). They asserted that while proof of the

1    likelihood of such discrimination would "support" its challenge to the acquisition, that proof was

2    not essential to it.  Professor Elzinga then testified at trial that he was not advancing a market

3    definition based on price discrimination.

4              45.      However, the standard economic intuition is that in the absence of price

5    discrimination, competition will protect both the customers whose "lesser" needs give them more

6    options and the very large enterprises whose allegedly greater needs give them fewer options.

7    (Tr. 2233:17-2234:1 (K. Elzinga)).  A traditional market definition (i.e., one not dependent on

8    price discrimination) would therefore conclude that all products in regular competitive

9    interaction are in the same product market.  This would be true even if, as Plaintiffs claim, the

10   largest global enterprises, as a class, could procure an acceptable enterprise-wide EAS system

11   from SAP, Oracle or PeopleSoft only.

12             46.      Establishing price discrimination markets was therefore not optional for

13   Plaintiffs; they were required to show that sellers can identify and discriminate against buyers

14   that have particular needs for certain products.  *In re R.R. Donnelley & Sons Co.,* 120 F.T.C. 36,

15   159-60; *see also Midcon Corp.*, 112 F.T.C. 93 at 141.  Without such a showing, defining a

16   market by reference to customer characteristics will "swallow up the market definition principles

17   established by the federal courts and the [Federal Trade] Commission."  *Donnelley,* 120 F.T.C. at

18   159-60; *Midcon*, 112 F.T.C. at 155, 158.

19             47.      Under the federal government's own *Merger Guidelines*, Plaintiffs

20   therefore needed to prove, first, that Oracle "can identify" the "targeted buyers"; second, that

21   Oracle can discriminate against the targeted buyers; and third, that it would be profitable for

22   Oracle to engage in price discrimination against those large organizations.  *Merger Guidelines* ¶

23   1.12; *Donnelley,* 120 F.T.C. at 158 (price discrimination market required that "(1) the

24   hypothetical monopolist can identify gravure customers with sufficiently inelastic demand for

25   gravure printing … [and] (2) the hypothetical monopolist can selectively and profitably increase

26   prices to those gravure customers.").

27             48.      There is no evidence that EAS vendors can or do identify and/or price

28   discriminate against some putative class of very large customers whose needs incline them

LATHAM&WATKINS LLP

1   towards Oracle, PeopleSoft or SAP products.  To the contrary, it is undisputed that the very

2   largest customers tend to get the largest discounts.[3]  Furthermore, while there are price (and

3   discount) differences between deals, the record fails to establish that those differences are

4   attributable to the exercise of market power as opposed to differences in the sizes of the clusters

5   (i.e. deals) involved, the timing of the deal (i.e. whether it occurs at the end of a vendor's

6   quarter), or other innocuous factors.  In particular, there is nothing to suggest that there are

7   certain large organizations that pay more or less for EAS software provided by SAP, Oracle and

8   PeopleSoft, based on whether they could turn to software that Plaintiffs relegate to the so-called

9   "mid-market."

10          49.     The government has also failed to prove that EAS vendors can identify

11  supposedly inelastic customers, let alone with the degree of accuracy needed to sustain profitable

12  price discrimination.  In markets such as these, where marginal costs are very small in relation to

13  price, vendors would incur very large losses from incorrect guesses as to which customers are

14  inelastic.  Accordingly, a vendor needs to have a very high confidence level before attempting

15  elasticity-based price discrimination.  (Tr. 3872-75 (J. Hausman); *see also* J. Hausman *et al.*,

16  *Market Definition Under Price Discrimination,* 64 Antitrust L.J. 367 (1996)).  Simply knowing

17  the customer's "functional needs" and the identity of one's competitor does not allow an EAS

18  vendor to identify inelastic customers to the required degree of consistency.  Price discrimination

19  requires understanding the customer's *valuation* of all its potential options, and there is no

20  evidence that EAS customers generally share with a vendor their views about the value they

21  place on the vendor's product relative to the products of others (or of doing nothing).  The trial

22  record shows that it is the customers who control the information provided to vendors, disclosing

23  what they deem in their best interests to disclose.  Indeed, the pretrial and trial proceedings in

24  _____

25  [3]   Larger customers pay more in absolute terms than smaller customers, but that is because they
          acquire more intellectual property rights to the software, *i.e.*, rights to more modules and
26        more users.  (Tr. 4494:22-4497:16 (D. Teece), 4057:25-4061:16 (J. Hausman)).  This is
          commonplace in intellectual property licensing and in no sense indicates the kind of
27        elasticity-based price discrimination upon which a separate market might be identified.  *See*
          Areeda & Hovenkamp ¶ 534d at 216 (explanations for price differentials unrelated to market
28        power must be eliminated before turning to price discrimination-based market definition).

LATHAM&WATKINSLLP

1  this case were repeatedly interrupted by motions and petitions from EAS customers seeking

2  confidentiality orders to protect documents that would reveal their valuations to their suppliers,

3  even months or years after a procurement ended.  This dramatically illustrated the artificiality of

4  Plaintiffs' claim that EAS vendors know enough to price discriminate.  At bottom, the

5  characteristics that supposedly identify inelastic high-function customers and distinguish them

6  from others in this industry are far too ambiguous, and far too sporadic in application to any

7  specific customer, to permit anything but isolated and transient possibilities for price

8  discrimination.

9           50.     The Court rejects the Plaintiffs' contention that high-function software is

10  an identifiable product that could support a traditional market definition.  Furthermore, because

11  Plaintiffs have failed to prove the basis for price discrimination markets, which they were

12  required to prove according to their own theory of competitive harm, the Court finds the

13  potential for SAP, Oracle and PeopleSoft EAS products to meet more of an enterprise's

14  functional needs does not warrant a separate market for those products only.

15                    **Conclusion on Product Market Definition**

16           51.     Based on the foregoing findings and analysis, the Court finds that

17  Plaintiffs have failed to meet their burden to prove that "high-function" FMS and HRM are

18  relevant "lines of commerce" in which to assess the proposed transaction.

19  **THE GEOGRAPHIC MARKET**

20           52.     The government claims that the relevant geographic market is limited to

21  the United States such that only sales of FMS and HRM products to US-based customers should

22  count for determining market shares.

23           53.     The relevant geographic market in an antitrust case is "the area of

24  effective competition . . . in which the seller operates, and to which the purchaser can practicably

25  turn for supplies."  *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961).  Where

26  US-based customers can turn to foreign firms for supply, a worldwide market is appropriate.

27  *United States v. Eastman Kodak Co.,* 63 F.3d 95, 104-09 (2d Cir. 1995).  As is the case with

28  market definition generally, the question is not whether every buyer could or would turn to

ORACLE  CORPORATION'S
PROPOSED CONCLUSIONS OF LAW
CASE NO. C 04-807 VRW

LATHAM&WATKINS<sub>LLP</sub>

1   foreign suppliers, but rather whether the number of customers switching would impose a

2   sufficient constraint on post-merger pricing.  *Tenet*, 186 F.3d at 1053-54.

3          54.    EAS is produced at many locations around the world and is marketed

4   regionally and globally.  The major suite vendors such as SAP, Oracle, PeopleSoft, Siebel and

5   Microsoft all market their EAS solutions globally.  Major point solution vendors such as Kronos

6   and Hyperion also market their products globally.  While global vendors compete with regional

7   software providers, e.g., AMS in the United States, this does not detract from the predominantly

8   global nature of the market.  As in *Eastman Kodak,* "the area where [EAS] sellers operate [lends]

9   strong support" for a world-wide market.  63 F.3d at 104.

10         55.    The Elzinga-Hogarty test, co-authored by Plaintiffs' principal economist,

11   Professor Elzinga, is commonly used by courts and antitrust enforcement agencies to determine

12   whether a specific area constitutes a relevant geographic market.  Under the Elzinga-Hogarty

13   test, a relevant geographic market must satisfy the following two conditions: (1) vendors outside

14   the proposed geographic market do not supply significant amounts of products within the

15   proposed market (the "Little In From Outside" or "LIFO" criterion) and (2) vendors inside the

16   area supply few products to those outside ("Little Out from Inside" or "LOFI" criterion).  If

17   either test is not satisfied, the area must be expanded.  Only when both tests are met does

18   Elzinga-Hogarty signal the existence of a relevant geographic market.  *Sutter*, 84 F. Supp. 2d at

19   1069; *Pilch v. French Hosp.*, 2000-1 Trade Cas. (CCH) ¶ 72,935 at 87,966-67 n.5 (C.D. Cal.

20   2000).

21         56.    The Elzinga-Hogarty test indicates a worldwide or at least US-plus-

22   Europe geographic market.  (Tr. 3801:3-5 (Hausman)).  Professor Elzinga admitted that his test

23   leads to a geographic market including at least Europe, where SAP is based and where it

24   produces its software.  (Tr. 2280:13-23 (Elzinga)).

25         57.    Transportation costs, i.e., the costs of shipping software code and human

26   assets such as sales personnel and consultants to a distant location, are trivial in relation to the

27   price of an EAS solution.  This also suggests a broad geographic market.  *Eastman Kodak,* 63

28   F.3d at 104.

ORACLE  CORPORATION'S
PROPOSED CONCLUSIONS OF LAW
CASE NO. C 04-807 VRW

LATHAM&WATKINS℠

58.     The government's proposed "high-function" product market is to a large extent based on product features that appeal to global enterprises, such as multi-language, multi-country and multi-currency capabilities.  Only a minority of the world's 2,000 largest enterprises (751, to be exact) are based in the United States.  (Tr. 3797:5-15 (Hausman)).  It would be anomalous to confine the geographic market to the US for a product alleged to be uniquely demanded by global enterprises, most of which are not US-based.

59.     Limiting the geographic market to the United States would be especially anomalous in this case, where the largest vendor of HRM and FMS (SAP) is headquartered in Germany.  The government has tried to defend this anomaly by claiming that SAP has a greater market share in Europe and the price effects of competition are different in the United States than in Europe.  As to the former, SAP's dominance in Europe and for that matter in a global market is precisely why one must take care to define the geographic market correctly.  Otherwise SAP's position among global enterprise customers could be understated improperly.  As to the latter, Professor Elzinga acknowledged that he could not support the claim of different pricing in the U.S. and Europe, and to the contrary Professor Hausman demonstrated based on PeopleSoft data that average discounts in the U.S. and Europe are almost identical.  (Tr. 3805:2-3806:4 (Hausman)).  Under the economic principle that a market is an area that tends to price uniformity, this indicates that the U.S. and Europe are part of the same geographic market. IIA P. Areeda & H. Hovenkamp, ANTITRUST LAW ¶ 550a at 248 (2002) ("Closely correlated prices and price movements in two regions presumptively indicate a single market.").

60.     Plaintiffs' argument that the inability to arbitrage EAS systems indicates a U.S.-only market is without merit.  While it is true that physical arbitrage of installed EAS systems from Europe to the United States is impossible, that is as much true within the United States.  Thus, the same "absence of arbitrage" principle could be used to support a claim that the geographic market was California only, Northern California only, or San Francisco only.  The inability to arbitrage EAS systems does nothing to support any particular geographic market.  Furthermore, it is not necessary for arbitrageurs to ship foreign-made EAS into the United States; the vendors, such as SAP, will do it themselves.  *United States v. Grinnell Corp.*, 384 U.S. 563,

575-76 (1966) (affirming national geographic market for "accredited central station [alarm] services," despite quintessential local nature of service, because it "reflects the reality of the way in which [suppliers] built and conduct their business.").

61.     Plaintiffs' argument that the "relationship" formed between an EAS vendor and a customer indicates a U.S.-only market is also without merit.  At best, this relationship is based on human assets that are also easily "transported" (which in substance may include hiring personnel locally throughout the world, as all the major vendors have).  More importantly, Plaintiffs have repeatedly stressed the global capabilities of SAP, Oracle and PeopleSoft to serve customers around the world with "24/7" "follow-the-sun" service and support.  This cannot be squared with the claim that a local, U.S.-based relationship is the key to selling EAS solutions, thus indicating a U.S.-only market.

62.     Plaintiffs' claim of a U.S.-only market leads to absurd conclusions.  For example, Professor Elzinga admitted that EAS purchases by global companies such as Toyota and DaimlerChrysler would be included in the alleged relevant market if made by their U.S. subsidiaries but not by the parent corporations based outside the U.S.  This makes no economic sense.

63.     Plaintiffs' proposed U.S.-only market essentially cuts SAP into two companies – a U.S. company and a rest-of-world company – only one of which (SAP America) counts for the present analysis.  This reduces SAP's share of the U.S. market, and thus necessarily increases the shares of Oracle and PeopleSoft.  The Court finds this is arbitrary and unjustified.  Whatever the corporate formalities, SAP is one firm whose formidable assets can be deployed wherever its management chooses.  *See Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 762 (1984).  If, as a result of this merger or otherwise, prices in the U.S. were to rise relative to other regions, SAP could easily shift its resources to compete away any excess profits.  Whether viewed (however arbitrarily) as "entry" by SAP AG or more appropriately as the natural behavior of a global firm in a global market, it is clear that SAP's overall competitive resources must be accounted for in the Court's analysis.  *See Eastman Kodak,* 63 F.3d at 103-04 (citing William M. Landes & Richard A. Posner, *Market Power in Antitrust Cases,* 94 Harv. L.

LATHAM&WATKINS LLP

Rev. 937 (1981) ("[I]f a distant seller has some sales in a local market, *all* its sales, wherever made, should be considered a part of that local market for purposes of computing the market share of a local seller."); *cf. AD/SAT v. Associated Press*, 181 F.3d 216, 227 (2d Cir. 1999) ("[W]here there is cross-elasticity of supply, a would be monopolist's attempt to charge supra-competitive prices will be thwarted by the existence of firms willing to shift resources to producing the product, thereby increasing supply and driving prices back to competitive levels.").

64.     The Court rejects Plaintiffs' claim of a US-only geographic market.

**THE BURDEN OF PROVING SUBSTANTIAL LESSENING OF COMPETITION**

65.     In addition to bearing the burden of proving a viable relevant market, the government always bears the burden of persuasion that the acquisition threatens a substantial lessening of competition or tends to create a monopoly in the relevant market.  *United States v. Baker Hughes Inc.*, 908 F.2d 981, 987 (D.C. Cir. 1990); *Sungard*, 172 F. Supp. 2d at 180.

66.     The likelihood of adverse competitive effects may in some cases be presumed from market statistics demonstrating a substantial increase in market concentration in a concentrated market.  This presumption is unavailable, however, when plaintiff has failed to prove a well-defined relevant market.  *Sungard,* 172 F. Supp. 2d at 181*; Sutter,* 84 F. Supp. 2d at 1068.

67.     In addition, the presumption of a "substantial lessening of competition" from market concentration statistics has historically been based on the concern that concentration will lead to "coordinated effects" – *i.e.,* that it will enhance the ability of post-merger rivals to coordinate their pricing.  *Hospital Corp. of America v. FTC*, 807 F.2d 1381, 1386 (7th Cir. 1986) ("When an economic approach is taken in a section 7 case, the ultimate issue is whether the challenged acquisition is likely to facilitate collusion."); *see also United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 326 (1963).  However, that basis for the presumption does not arise here for several reasons.

68.     First, neither the Plaintiffs' Complaint nor its opening statement at trial alleged any likelihood of coordinated effects. Plaintiffs asserted for the first time in their

LATHAM&WATKINS LLP

1   argument against Oracle's motion for judgment as a matter of law that SAP might not compete

2   vigorously with Oracle after the acquisition, but this claim was based on the fact that SAP is a

3   substantial reseller of Oracle database software rather than on the acquisition itself.  The record

4   belies the claim, showing that SAP has long been a substantial reseller of Oracle's database

5   software but has nevertheless competed vigorously with Oracle for the sale of applications

6   software.  There is no basis in the record for speculation that that will change if Oracle acquires

7   PeopleSoft.

8          69.    Second, the record establishes that there is no likelihood that coordinated

9   effects will occur.  Tacit coordination is likely only where there is "a stable market environment,

10  fungible products, and a small number of variables upon which the firms seeking to coordinate

11  their pricing may focus."  *Brooke Group v. Brown & Williamson Tobacco Corp.,* 509 U.S. 209,

12  238 (1993); *see also Merger Guidelines* ¶¶ 11, 2.12 (coordinated effects are likely only where

13  "product or firm homogeneity" facilitates agreement and "cheating" can be readily detected and

14  punished.)  The record shows that these conditions do not exist here.  There is no dispute that the

15  products at issue are differentiated rather than fungible.  Moreover, the record shows that those

16  products are generally sold as components of larger and even more differentiated bundles of

17  additional products and services.  Under those circumstances, vendors of HRM and/or FMS

18  cannot effectively coordinate their prices and terms.  There is no realistic prospect that the

19  proposed transaction will enhance the likelihood of coordinated effects.

20         70.    This, instead, is a merger challenge under the theory of unilateral effects, a

21  relatively recent doctrine postulating that an acquisition would allow the merged firm to raise

22  prices on its own, and not dependent on an accommodating response from rivals.  *See generally*

23  *Merger Guidelines* ¶ 2.21; Carl Shapiro, *Mergers with Differentiated Products*, Antitrust 23

24  (Spring 1996); *see also Kraft*, 926 F. Supp. at 366 (assuming, *arguendo*, that the *Merger*

25  *Guidelines'* concern for this effect is valid).  Unilateral effects doctrine applies where

26  competition is "non-uniform (i.e., localized), so that individual sellers compete more directly

27  with those rivals selling closer substitutes."  *Merger Guidelines* ¶ 2.21.  As such, a concentrated

28  market alone, or even a substantial increase in concentration, does not necessarily predict

adverse unilateral effects.  At the very least one must establish that the "localized competition" concern is present, substantial and implicated by the merger, i.e., that "a significant share of sales in the market [is] accounted for by consumers who regard the products of the merging firms as their first and second choices."  *Id.*  Furthermore, antitrust courts generally assess the ability of a firm to exercise market power unilaterally by reference to its own market share, not market concentration generally.  In *Rebel Oil*, for example, the Ninth Circuit held that the defendant's approximately 40% market share was insufficient to infer unilateral market power.  *Rebel Oil*, 51 F.3d at 1438; *see also Jefferson Parish Hosp. Dist. No. 2. v. Hyde*, 466 U.S. 2, 8, 26 (1984) (30% market share below threshold for market power, as matter of law).

71.    Because unilateral effects analysis and the assessment of unilateral market power rest on different economic foundations than the coordinated effects concerns underlying antitrust law's traditional concern with market concentration *per se*, neither HHI statistics nor a simple competitor count (*i.e.*, "three to two") permits a presumption or even an inference of likely adverse effects on competition.  Accordingly, the Court must proceed to analyze the potential for adverse unilateral effects under the particular framework for that doctrine and in light of all of the facts and circumstances present in the record.

72.    Finally, even if the government's market definitions were accepted, a presumption of likely adverse effects from the reduction of sellers from "three to two" would not, in this case, warrant a presumption of adverse effects.  There is certainly a history in antitrust law of presuming that "the number of sellers matters" to competitive outcomes, but as Oracle's expert, Dean Tom Campbell, explained, that presumption rests on experience with markets quite different than those at issue here.  EAS products are sold through a process of simultaneous (but separate, except as buyers may dictate) bilateral negotiations typically involving only one or two sellers in the final pricing rounds.  The buyers at issue in this case are large, sophisticated, and possess considerable buying power of their own.  As Plaintiffs' experts acknowledged, there is no economic literature supporting an inference of adverse effects from a reduction in the number of market participants in this kind of market.  (Tr. 2591:5-11 (P. McAfee)).  Consequently, there is no basis for presuming that effect.  As in other areas of

1    antitrust law where experience and economic theory do not warrant presumptions of

2    anticompetitive effects, a fact-based inquiry into the important market realities is required.  *See,*

3    *e.g.*, *California Dental Ass'n v. FTC,* 526 U.S. 756, 781 (1999).

4    **UNILATERAL EFFECTS**

5              73.       Accepting *arguendo* Plaintiff's proposed three-vendor market, the

6    required predicates for a valid unilateral-effects theory are not present here.  First, it should be

7    noted that this case does not even arguably present the unilateral effects issue addressed in the

8    *Merger Guidelines.*  That theory does not involve price discrimination to individual inelastic

9    customers – a critical component of Plaintiffs' approach to this case.  Rather, it postulates that

10   acquiring a close substitute may permit a profitable market-wide price increase because sales that

11   would have been lost to the acquired firm pre-merger are internalized to the combined firm post-

12   merger.  *See Merger Guidelines* § 2.21 ("Some of the sales loss due to the price rise merely will

13   be diverted to the product of the merger partner and, depending on relative margins, capturing

14   such sales loss through merger may make the price increase profitable even though it would not

15   have been profitable premerger.")  Plaintiffs in this case have never suggested that kind of

16   adverse unilateral effect.  They are in reality proposing a new and heretofore unknown variant of

17   unilateral effects analysis rooted firmly in the potential for price discrimination:  namely, that a

18   post-merger Oracle could selectively increase prices to those customers for whom SAP and other

19   alternatives are substantially inferior, relative to PeopleSoft's current product.  That theory

20   necessarily fails for all the reasons, discussed above, that price discriminations markets cannot be

21   established in this case.

22             74.       In addition, Plaintiffs have not established the kind of localized

23   competition that even presents a legitimate unilateral effects issue.  This is not, for example, a

24   case like *FTC v. Staples, Inc.,* 970 F. Supp. 1066 (D.D.C. 1997), where office supply

25   "superstores" were clearly differentiated from smaller stationary stores, nor like *United States v.*

26   *Vail Resorts, Inc.,* 1997-2 Trade Cas. (CCH) ¶ 72,030 (D. Colo. 1997), where the government

27   obtained a consent decree prohibiting the merger of two ski resorts that were geographically

28   closer substitutes than other competing resorts.  The evidence in this case clearly shows that all

three vendors the government assigns to the alleged relevant markets – SAP, Oracle and PeopleSoft – pursue fundamentally the same strategy of providing comprehensive EAS solutions to large enterprises.  As a general matter, there is nothing about SAP that places it in a "product space" that is meaningfully "distant" from Oracle or PeopleSoft.

75.     This is not to say that SAP, Oracle and PeopleSoft products are fungible.  The market is differentiated, and therefore by definition the competing products are not fungible.  Furthermore, as in all differentiated-product markets, there are no doubt some buyers that prefer Oracle and PeopleSoft products to SAP products.  The Plaintiffs' problem is that there is no basis for finding the kind or degree of tangible product differentiation that might give a merged Oracle-PeopleSoft a break from the competitive pressures Oracle experiences today.  There are no product features Oracle and PeopleSoft have, but SAP lacks, that would, if included in an RFP, reveal customers disinclined to purchase SAP products.  There is no identifiable class of large enterprises that cannot credibly threaten to buy SAP products.  The threshold requirement of unilateral effects analysis – localized competition dominated by the merging parties – is simply not present in this case.

76.     The Court notes the government's various efforts to identify SAP product weaknesses, but rejects these arguments as insubstantial.  The most frequently cited, an alleged SAP weakness in the sale of EAS solutions to U.S.-based financial services institutions, was never substantiated by any detailing of what the alleged product deficiency is, or whether it has anything to do with core FMS or HRM.  Furthermore, SAP has recently formed a joint venture with Accenture, the systems integrator with the strongest standing in the financial services industries, that is designed to turn the alleged weakness into an area of strength within eighteen to twenty-four months.  The government has also done nothing to demonstrate that the number of financial institutions that view Oracle and PeopleSoft as their best substitutes is significant.  And no other SAP product weaknesses were even alleged, let alone proven and correlated with an area in which both Oracle and PeopleSoft are strong.

77.     The government's only other argument on this score was that enterprises currently using Oracle and PeopleSoft products, but not SAP products, would most likely not

1    view SAP products to be as attractive an option as adding more Oracle or PeopleSoft products to

2    the enterprise's EAS footprint.  To the extent this is true, it is a reflection of integration costs and

3    the resulting advantages of incumbency, not product differentiation.  There is nothing in either

4    the Merger Guidelines or the case law that suggests this kind of an advantage presents a

5    unilateral effects issue.  Furthermore, the government has again failed to prove this effect is

6    substantial in relation to the market as a whole.  There is no evidence as to how many customers

7    have the required combination of some Oracle EAS, some PeopleSoft, but no SAP EAS.  One

8    would expect SAP, as the most successful EAS vendor by far, especially with respect to large

9    enterprises, to enjoy the strongest incumbency advantages in the industry.  In the absence of

10   tangible evidence that SAP cannot compete for the comparatively few large enterprises it does

11   not already serve to some degree, the Court is unwilling to find a unilateral effects issue based on

12   this kind of speculation.

13          78.     The record evidence, far from indicating that SAP is a distant substitute to

14   Oracle and PeopleSoft, strongly suggests that SAP is in fact the closest substitute for each.  This

15   is the logical inference from SAP's leading market share overall, and its acknowledged

16   dominance among large global enterprises.  The inference was confirmed, moreover, by the

17   regressions conducted by the parties' experts, which, despite their many limitations, indicated

18   that SAP, not PeopleSoft, induces Oracle to give the largest discounts.  This is a striking contrast

19   to *Staples,* where the case turned to a large degree on evidence from the merging parties' own

20   files that "prices are significantly lower in markets where Staples and Office Depot [the merging

21   parties] compete."  970 F. Supp. at 1082.  Here, it is a non-merging firm, SAP, that most

22   effectively disciplines Oracle's pricing.  The threshold requirement for even conducting a

23   unilateral effects analysis is therefore lacking in this case.

24          79.     That said, it is clear that applying the *Merger Guidelines*' unilateral effects

25   analysis also leads to the conclusion of no likely adverse effects.

26          80.     First, the Merger Guidelines will infer that "a significant share of sales in

27   the market are accounted for by consumers who regard the products of the merging firms as their

28   first and second choices" only when the merging firms have a combined market share of at least

LATHAM&WATKINS LLP

1    thirty-five percent.  *Merger Guidelines* ¶ 2.211.  As previously discussed, Plaintiffs' failure

2    properly to define the relevant market means that it cannot meet that requirement.  Second, the

3    *Merger Guidelines* specifically provide that "[a] merger is not likely to lead to unilateral

4    elevation of prices of differentiated products if, in response to such an effect, rival sellers likely

5    would replace any localized competition lost through the merger by repositioning their product

6    lines."  *Id*.  The government has not met that requirement either.  To the contrary, the record

7    shows that, even without repositioning, SAP could readily replace PeopleSoft in any

8    procurement in which the latter has been the second vendor in the negotiations.  In many cases,

9    vendors such as Lawson, ADP and AMS could as well.

10       81.    Professor Elzinga criticized the *Merger Guidelines* for demanding too

11   much of the government.  The Court takes this as more of an admission that the requirements of

12   the Guidelines cannot be met than as genuine criticism of the unilateral effects analysis found in

13   the Guidelines.  In any event, both Professor Elzinga and Professor McAfee failed to provide any

14   persuasive evidence, consistent with or independent of that required by the Guidelines, that this

15   transaction would likely result in adverse unilateral effects.

16       82.    The Court specifically rejects as simplistic and unpersuasive Professor

17   Elzinga's argument that a reduction in the number of firms capable of serving large enterprises

18   from 3 to 2 will likely lead to an elevation of prices.  First, the premise is false.  However, even

19   were it true, the circumstances of this case do not permit any finding that prices would rise as the

20   number of qualified bidders falls.  To the contrary, the evidence is overwhelming that a

21   substantial majority of prospective EAS buyers voluntarily limit the number of firms with which

22   they negotiate prices to only one or two, and still obtain competitive pricing.  Conversely, there

23   is no evidence that the presence of a third competing firm in the pricing rounds materially

24   improves realized prices.  Regressions performed by Professor Hausman indicate that the

25   presence of a third firm in a procurement has no meaningful impact on the discounts offered by

26   Oracle.  (Tr. 3791:14-21, 3853:6-16, 3888:9-3889:7 (Hausman)).

27       83.    The *Merger Guidelines* explicitly recognize that "[i]n markets where it is

28   costly for buyers to evaluate product quality, buyers who consider purchasing from both merging

1    parties may limit the total number of sellers they consider." *Merger Guidelines* ¶ 2.212.  For

2    such cases the Guidelines do not infer adverse effects from a reduction in the number of potential

3    sellers.  They state instead that "[i]f either of the merging firms would be replaced in such

4    buyers' consideration by an equally competitive seller not formerly considered, then the merger

5    is not likely to lead to a unilateral elevation of prices." *Id.*  In other words, if buyers can

6    replicate the pre-merger pricing environment by replacing a lost firm with "an equally

7    competitive seller not formerly considered," one should not presume an adverse unilateral effect.

8    That is the case here.  In today's market, two-firm final rounds ("RFQs" or "bake-offs") are the

9    market norm, presumably because they lead to optimal outcomes for buyers.  *See Aspen Skiing*

10   *Co. v. Aspen Highlands Skiing Co.,* 472 U.S. 585, 604 n.31 (1985) (longstanding market

11   practices are presumptively optimal) (quoting Robert H. Bork, *The Antitrust Paradox* 156

12   (1978)).  So long as SAP or other vendors can replace, in post-merger negotiations, the

13   competitive pressure now supplied by PeopleSoft (on those occasions when it goes head-to-head

14   with Oracle), there is no basis for finding an adverse unilateral effect.

15              84.      The government has failed to prove that, post-merger, buyers that would

16   have taken Oracle and PeopleSoft to the final round could not replace PeopleSoft with "an

17   equally competitive seller."  To do so, the government would need to show that Oracle, post-

18   merger, would be able to tell that its final round rival, whether that was SAP, Lawson or another

19   vendor, was in the buyer's estimation substantially less attractive than PeopleSoft would have

20   been, permitting Oracle to charge a premium price.  As Professor Hausman demonstrated, Oracle

21   would need to be all but certain this was the case to risk losing a deal by pricing so as to exercise

22   unilateral market power.  There is no basis, however, for finding that buyers would ever reveal,

23   or that Oracle could ascertain, the kind and quality of information that would permit Oracle to

24   dismiss SAP as a poor substitute for PeopleSoft.  Again, SAP is the leading firm in the market

25   and the firm that today causes Oracle to discount most aggressively.  Customers could readily

26   propose SAP as a credible alternative to Oracle, and Oracle would need to take SAP very

27   seriously in any procurement where it was the finalist.

28

85.     Neither is there any basis in the record for finding that Oracle could dismiss the presence of other vendors as credible final round competitors.  Other vendors already make it into the final rounds of procurements conducted by large and complex enterprises, particularly in the verticals in which they are focused, and often win.  Given that track record, it is pure speculation that Oracle could dismiss their presence in post-merger final rounds and successfully exercise market power.  Indeed, in order for a so-called mid-market vendor to make the final round of a procurement – as happens frequently in today's market – it usually must first beat out one or more of the supposed "high-function" software vendors.  Such firms cannot be dismissed as weak competitors.

86.     It is possible, of course, that Oracle might occasionally be able to tell that a given customer is not able to replace PeopleSoft with an equally competitive seller.  This does not change the Court's conclusions.  Section 7 requires proof of a likely "substantial" adverse impact on competition in a "line of commerce."  A *de minimis* impact will not suffice.  *Brown Shoe*, 370 U.S. at 328; *Gerlinger v. Amazon.com, Inc.*, 2004-1 Trade Cas. (CCH) ¶74, 363 at 98, 876 (N.D. Cal. 2004).  Where, as here, there is only a possibility of sporadic post-merger effects on specific customers, antitrust intervention is inappropriate.

87.     The Court also rejects Professor McAfee's "merger simulation" as simplistic and unreliable.  In the first place, this is nothing like the sophisticated merger simulations employed in cases like *Staples* and discussed in the current economic literature.  *See, e.g.*, Gregory J. Werden, Luke M. Froeb and David T. Scheffman, *A Daubert Discipline for Merger Simulation,* (Feb. 2004 draft *available at www.ftc.gov/be/daubertdiscipline.pdf*)*;* Jerry A. Hausman & Gregory K. Leonard, *Economic Analysis of Differentiated Products Mergers Using Real World Data,* 5 Geo. Mason L. Rev. 321 (1997).  Such models attempt to estimate the effects of mergers by calculating own- and cross-price elasticities from real-world data.  In contrast, Professor McAfee's model has only two data inputs, market shares (which he obtained from Professor Elzinga, and which are invalid because of the incorrect market definitions employed) and a crude estimate of the degree to which consumers currently capture surplus.  The model will always predict a price increase from a merger, and paradoxically it will predict a *greater* price

LATHAM&WATKINS^LLP

1   increase from a "three to two" merger the more competition thrives under the supposed pre-

2   merger oligopoly conditions.  This makes no sense.  If, as the facts of this case indicate,

3   competition thrives despite alleged oligopoly conditions, one should question the relationship

4   between market structure and performance, not hard-wire into a merger simulation the belief that

5   the number of competitors is the driver of market performance.

6          88.    Professor McAfee's model is also strikingly at odds with the observed

7   behavior of buyers in the relevant markets.  Rooted in auction theory, the model presumes that

8   the number of "bidders" is a primary determinant of realized prices.  EAS buyers, however,

9   voluntarily limit the number of firms with which they negotiate prices, typically to one or two.

10  Indeed, of the over 200 procurements Professor McAfee studied for his regressions, SAP, Oracle

11  and PeopleSoft all went head-to-head against one another in less than two percent of the cases.

12  The industry-standard practice of limiting the number of "bidders" would be highly irrational

13  behavior if the assumptions of the McAfee model were reflective of market realities.  In reality,

14  EAS buyers do not conduct auctions, but rather engage in free-form simultaneous bilateral

15  negotiations in which not only prices, but the nature and scope of the product sold, service

16  commitments, terms and conditions, and other factors are negotiated.  None of this complexity is

17  captured by Professor McAfee's model, rendering its results wholly unreliable and unpersuasive.

18  *See Concord Boat Corp. v. Brunswick Corp.,* 207 F.3d 1039, 1056 (8th Cit. 2000) (economic

19  model that did not fit facts of industry was inadmissible); *Heary Bros. v. Lightning Prot. Inst.,*

20  287 F. Supp. 2d 1038, 1066 (D. Ariz. 2003) (same).

21         89.    In sum, the evidence provides no basis upon which the Court can find a

22  likelihood of adverse unilateral effects from the proposed transaction.  The "localized

23  competition" premise of the theory does not apply, the *Merger Guidelines'* analysis suggests

24  there is not a unilateral effects problem, and the contentions of Plaintiffs' experts that adverse

25  unilateral effects would arise through price discrimination are unfounded.

26  **ENTRY AND EXPANSION**

27         90.    Contemporary merger analysis recognizes that "[i]n the absence of

28  significant [entry] barriers, a company probably cannot maintain supracompetitive pricing for

LATHAM&WATKINS<sub>LLP</sub>

1   any length of time," even in a highly concentrated market.  *United States v. Baker Hughes Inc.*,

2   908 F.2d 981, 987 (D.C. Cir. 1990); *see also California v. American Stores Co.*, 872 F.2d 837,

3   842-43 (9th Cir. 1989) ("[a]n absence of entry barriers into a market constrains anticompetitive

4   conduct, irrespective of the market's degree of concentration").  Likewise, if existing firms in the

5   market can expand their output in response to the attempted exercise of market power, *i.e.,* there

6   are insignificant barriers to expansion, the sustained exercise of market power is unlikely.  *Rebel*

7   *Oil Co. v. Atlantic Richfield Co.* 51 F.3d 1421, 1441 (9th Cir. 1995).

8          91.    Plaintiffs have vigorously asserted that entry into the "high-function"

9   HRM and FMS markets would be time-consuming, difficult, and beyond the means of any

10  potential vendors, even Microsoft.  Plaintiffs' entry arguments, however, are riddled with flaws

11  and are unpersuasive.

12         92.    In the first place, Plaintiffs relegate all EAS vendors other than SAP,

13  Oracle and PeopleSoft into the category of potential competitors; that is, firms presently not in

14  the relevant markets, and by hypothesis without the right products to compete for large and

15  complex enterprises.  This is incorrect.  Firms such as Lawson, AMS, ADP and even Microsoft

16  have already "entered" at least parts of the alleged markets.  Plaintiffs acknowledge Lawson's

17  and AMS's presence, and mostly seek to cabin them to parts of the relevant markets.  Plaintiffs

18  deny Microsoft's presence, but the evidence shows that with its Axapta product Microsoft is

19  already seeking EAS business from large (if not the very largest) enterprises, and has formed an

20  alliance with BearingPoint to target companies in what Microsoft calls the "Corporate Account

21  Space."  That is, by any definition, "entry," even if in Microsoft's case it is very recent entry.

22  Accordingly, the question is not whether these firms can enter the alleged relevant markets, but

23  whether as relatively small players today they can expand their positions to discipline the

24  exercise of unilateral market power.

25         93.    Second, the lesson to be learned from firms such as Lawson, AMS, Retek

26  and SCT (to name a few), is that one does not need to become SAP, Oracle or PeopleSoft to

27  enter and prosper in the alleged relevant markets.  Plaintiffs consistently make the mistake of

28  presuming one must duplicate the scale and scope of PeopleSoft to be a credible competitive

LATHAM&WATKINS LLP

1  alternative as a seller of "high-function" software.  However, as Professor Hausman explained,

2  the relevant question is whether it is feasible for firms not presently serving verticals or other

3  parts of the market where unilateral market power might be exercised to move into those

4  segments and compete away supracompetitive prices.  (Tr. 3839:1-3842:2 (J. Hausman)).  The

5  success of vendors such as Lawson, AMS, Retek and SCT proves it is feasible, and that there are

6  not significant barriers to entry or expansion into verticals.  Whether it is feasible for a new

7  entrant to replicate PeopleSoft is beside the point.

8          94.     Third, Plaintiffs' entry arguments have consistently misstated the relevant

9  standard by which to judge the timeliness of entry or expansion.  In their Trial Brief and

10  elsewhere, Plaintiffs have cited the two-year standard of ¶ 3.2 of the *Merger Guidelines*.  They

11  neglect to mention, however, that ¶ 3.2 contains an exception for durable goods:  "Where the

12  relevant product is a durable good, consumers, in response to a significant commitment to entry,

13  may defer purchases by making additional investments to extend the useful life of previously

14  purchased goods and in this way deter or counteract for a time the competitive effects of

15  concern.  In these circumstances, if entry only can occur outside of the two year period, the

16  Agency will consider entry to be timely so long as it would deter or counteract the competitive

17  effects of concern within the two-year period and subsequently."  *Id*.  EAS systems are durable

18  goods, and the evidence shows that large enterprises can and do delay their purchases of new

19  EAS systems for substantial periods of time, *e.g.*, many years in the case of Plaintiffs' witness

20  Greyhound.  This means a time period longer than two years must be used to assess entry and

21  expansion in this case.

22          95.     This is particularly significant in the consideration of Microsoft's ongoing

23  efforts to build an EAS business, which Plaintiffs (with Microsoft's support) claim will not put

24  Microsoft in the position to compete for large enterprise HRM and FMS business for several

25  years, perhaps four or five.  This argument is undermined factually by Microsoft's present efforts

26  to market its Axapta products to all but the very largest enterprises.  But even putting that aside,

27  were it true that Microsoft would not have a robust FMS and HRM offering for the large

28  enterprise until 2007 or even 2009, the Court would still not dismiss Microsoft as an "untimely

LATHAM&WATKINS LLP

entrant." Microsoft's entry into the EAS business is already having profound competitive

effects, not the least of which is this proposed acquisition. Furthermore, in a business where

"vision" and future direction are so important to customer behavior, the prospect of a new, state

of the art Microsoft EAS product in the relatively near future can be expected to cause some

buyers to "defer purchases [of EAS systems] by making additional investments to extend the

useful life of previously purchased goods," and thereby to wait for the new Microsoft products.

*Merger Guidelines* § 3.2. This is a phenomenon that creates current competitive pressure on the

major EAS vendors, and it cannot be diminished by applying the "timeliness" branch of entry

law in an overly-wooden and erroneous manner.

96.     The Court finds Plaintiffs' entry and expansion arguments unpersuasive.

To the contrary, there appear to be no significant barriers to the kind of entry and expansion that

would be required to protect buyers from post-merger competitive harm.

**BUYER POWER**

97.     Even when the government is entitled to a presumption that an acquisition

is likely to have anticompetitive effects, that presumption is rebuttable and can be defeated by

evidence suggesting that the statistics on which the presumption is based may inaccurately

predict the transaction's probable effect on competition. *See Baker Hughes*, 908 F.2d at 984,

987. Those factors include the power and sophistication of the buyers involved. *Id.* at 986-87;

*United States v. Archer-Daniels-Midland Co.*, 781 F. Supp. 1400, 1422 (S.D. Iowa 2001); *United*

*States v. Country Lakes Foods*, 754 F. Supp. 669, 673, 679-80 (D. Minn. 1990).

98.     There is little likelihood that an acquisition will substantially lessen

competition if the buyers are sophisticated and powerful because under those circumstances,

even a vendor with market power is not likely to be able to exercise "power over price." *United*

*States v. Baker Hughes, Inc.*, 731 F. Supp. 3, 11 (D.D.C. 1990), *aff'd* 908 F.2d at 981 (D.C. Cir.

1990); *United States v. Archer-Daniels-Midland Co.*, 1991-2 Trade Case. (CCH) ¶ 69, 647 at 67,

918-19 (S.D. Iowa 1981); *United States v. Syufy Enter.*, 903 F.2d 659, 663 (9th Cir. 1990)

(Kozinski, J.) (describing government's monopolization claim as "remarkable" where "the

alleged victims are humongous national corporations with considerable market power of their

ORACLE CORPORATION'S
PROPOSED CONCLUSIONS OF LAW
CASE NO. C 04-807 VRW

LATHAM&WATKINS LLP

1  own.").  The record here establishes that the alleged "vulnerable customers" – the largest and

2  most sophisticated buyers of information technology in the world – have considerable buyer

3  power.  They are sophisticated negotiators (often supported by large consulting firms that are

4  true specialists in the negotiation of EAS purchases), with genuine leverage, who use their size,

5  power, and prospective value to the seller as references for future customers – and as future

6  customers for additional products and services –  to negotiate highly competitive prices.

7       99.    Significantly, the primary sources of buyer leverage are unaffected by the

8  proposed acquisition.  They include:  (a) the ability to make large purchases (both in terms of the

9  types of software involved and the number of "seats"); (b) the ability to credibly threaten to

10 divert some business to point solution providers or EAS vendor in other pillars; (c) the ability to

11 provide reference value; (d) the ability to justify internal development or IT outsourcing

12 initiatives that smaller companies would find uneconomic; (e) the ability to credibly threaten the

13 "do nothing" option, and (f) the ability to offer or withhold future purchases, specified and

14 unspecified.  To be sure, having a viable competitive option to a vendor's offering is also

15 important, but many such options will remain post-merger, not the least of which will be SAP –

16 the firm that most large enterprises turn to for these products.  There is no reason to conclude

17 that the loss of PeopleSoft as one competitive option will undermine the buyer leverage that is so

18 evident today.

19 **DYNAMIC COMPETITION AND INNOVATION**

20      100.    Finally, Plaintiffs claim that the acquisition is likely to chill innovation.

21 The record provides no basis for this conclusion.  To the contrary, the intensely dynamic nature

22 of the relevant markets is another reason not to be concerned about adverse competitive effects.

23      101.    In the first place, Plaintiffs' innovation argument rests on a logical fallacy

24 – that the exceedingly narrow product markets advanced to study price effects are the appropriate

25 markets for assessing innovation effects.  The government's own *Antitrust Guidelines for the*

26 *Licensing of Intellectual Property* adopt a different approach, choosing to address effects on

27 innovation in "innovation markets" that capture all "research and development efforts,

28 technologies, and goods that significantly constrain the exercise of market power with respect to

LATHAM&WATKINS LLP

the relevant research and development, for example by limiting the ability and incentive of a

hypothetical monopolist to retard the pace of research and development." U.S. Department of

Justice and FTC, *Antitrust Guidelines for the Licensing of Intellectual Property,* available at

http://www.usdoj.gov/atr/public/guidelines/ipguide.htm#t321. § 3.2.3.  This is a reflection that

the forces that promote innovation, and constrain efforts to slow the pace of innovation, are not

necessarily contained in "goods markets" defined by the *Merger Guidelines*.  The government

has never even addressed innovation effects from this perspective, instead implying that as goes

price competition, so goes innovation.  This is contrary to the record evidence.

102.    In this case, the evidence clearly shows that far more than rivalry for

"high-function" customers drives innovation.  As Professor Teece testified, the same code base is

marketed by EAS vendors to large and medium-sized customers alike, requiring them to respond

to innovations not only by those vendors serving the largest customers, but by market

participants serving all substantial enterprises.  These include the many point solution and best-

of-breed providers that constantly push the state of the art in particular modules and

functionalities.  It also includes vertical specialists like AMS, Lawson and Retek.  And of course

it includes Microsoft, whose large investments in a new EAS code base built on the .NET

platform ("Project Green") would surely induce appropriate competitive responses.  In short, the

evidence shows this is a highly dynamic market in which the forces of innovation are

omnipresent.  In this environment, it is sheer speculation to claim that the acquisition of

PeopleSoft would retard innovation. *See United States v. Microsoft Corp.,* 253 F.3d 34, 49 (D.C.

Cir. 2001) ("Rapid technological change leads to markets in which firms compete through

innovation for temporary market dominance, from which they may be displaced by the next

wave of product advancements.") (internal quotations omitted).

103.    The record also shows that Oracle has, and will continue to have, an

incentive to engage in product innovation because it faces vigorous competition from much

larger rivals at multiple levels of the technology "stack."  The emergence of the applications

integration layer described by Dale Kutnick and Professor Teece is a clear example of this,

having brought applications suite vendors into direct competition with middleware providers

such as IBM.  There is also clear evidence of "stack-based" competition among SAP, Oracle, IBM and Microsoft that will provide a continuing spur to innovation.  This kind of competition is of fundamental importance to the relevant markets and cannot be ignored by asserting that it takes place "outside the market."  In fact, it undermines the government's market definitions as well as its competitive effects analysis.  *FTC v. R.R. Donnelley & Sons Co.,* Civ. A. No. 90-1619 SSH 1990 WL 193674, at *4 (D.D.C. Aug. 27, 1990) (market definition should be expanded because the ability of a substitute product to compete "will be enhanced in the future because of further technological and market developments").

104.    In short, the record provides no basis for predicting that the acquisition will reduce innovation.  To the contrary, innovation will help assure a competitive post-merger market.

**HARM TO THE PEOPLESOFT INSTALLED BASE**

105.    As an additional adverse effect on competition, Plaintiffs claim that existing PeopleSoft customers could face migration costs, higher maintenance fees and a reduction in the quality of ongoing upgrades and enhancements should Oracle acquire PeopleSoft.  Several current PeopleSoft customers backed this claim at trial, at least by expressing their fears of such an outcome.  Nevertheless, this claim is both factually and legally deficient.

106.    In the first place, the fears expressed by PeopleSoft customers do not relate to any alleged competition-reducing effects of the transaction.  *See generally Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc*., 429 U.S. 477, 488-89 (1977) (defining "antitrust injury" in the merger context as an injury which occurs "'by reason of' that which made the acquisitions unlawful").  Rather, they relate to the potential for the customer's investment in PeopleSoft products to be stranded because those products may be harder to maintain indefinitely.  Such harm (assuming it transpired) would be unrelated to any reduction in competition.  That is, a customer's investment in PeopleSoft products does not become stranded because the proposed competition is anticompetitive; it is stranded if the products are not maintained as long as PeopleSoft might maintain them, whether or not competition is harmed.  A competitively benign

1    acquisition of PeopleSoft by Oracle threatens the same stranded investment as a competitively

2    harmful acquisition.  *See* Tr. 2547:23-2548:2 (P. McAfee) (acknowledging that customers who

3    had invested in the PeopleSoft platform would have incentives to oppose the proposed

4    acquisition even if it did not harm competition).  For this reason, the Court does not regard the

5    potential for stranded investment to present an antitrust concern.

6            107.    The Court also rejects the claim that Oracle would likely raise

7    maintenance costs or reduce quality.  In reaching this conclusion, the Court notes but does not

8    rely on Oracle's public commitments to support the current PeopleSoft products.  Rather, the

9    Court finds that Oracle's economic incentives, and indeed the entire rationale for the PeopleSoft

10   acquisition, require Oracle to maintain highly competitive support and maintenance practices.

11           108.    Numerous courts have recognized that "systems level" competition for

12   new customers and new business generally disciplines any temptations to exploit one's "installed

13   base" of "aftermarket" customers, whether or not such customers are locked-in by switching

14   costs.  As the Court said in *SMS Sys. Maint. Servs. v. Digital Equip. Corp.*, 188 F.3d 11, 18 (1st

15   Cir. 1999):

16               Reputation is important to a firm that constantly competes for new
                 customers, and a manufacturer's behavior in the aftermarket
17               probably will be scrutinized by customers shopping for the firm's
                 products in the primary market. If the firm has a bad reputation,
18               that will prompt potential customers to go elsewhere. Moreover,
                 such a firm eventually will suffer defections from its installed base
19               as well, for firms concerned with the long term cannot afford to
                 bite the hands that feed them.
20

21           109.    The evidence demonstrates that Oracle's desire to compete for new

22   customers and new business, and especially to convince the PeopleSoft customers to remain

23   Oracle customers, would ensure highly competitive behavior toward the acquired installed base.

24   After all (and as Plaintiffs are quick to point out), Oracle is not proposing to buy PeopleSoft for

25   technology or other tangible assets, but rather for the installed base of customers.  The

26   acquisition would cease to make economic sense if Oracle turned around and exploited that

27   installed base, a course of action that would most likely drive the current PeopleSoft customers

28   to SAP or other competitors.  These customers, it must be remembered, will eventually need to

LATHAM&WATKINS LLP

1    upgrade to something, either to Oracle products or others'.  Oracle can expect to maintain them

2    as customers only by behaving competitively at all times, including for whatever period passes

3    before such customers make an upgrade decision.

4    **EFFICIENCIES**

5            110.    "[E]conomic efficiency is one of the main goals of antitrust . . . ."  Thomas

6    B. Leary, *Efficiences and Antitrust: A Story of Ongoing Evolution*,  ABA Section of Antitrust

7    Law Fall Forum 2002, Washington, D.C. (Nov. 8, 2002)(available at

8    http://www.ftc.gov/speeches/leary/efficienciesandantitrust.htm; visited July 7, 2004).  The

9    *Merger Guidelines* now explicitly provide for consideration of efficiencies in the evaluation of

10   mergers under Section 7, noting, "Efficiencies generated through merger can enhance the merged

11   firm's ability and incentive to compete, which may result in lower prices, improved quality,

12   enhanced service, or new products." *Merger Guidelines* ¶ 4; quoted, *United States v. Long*

13   *Island Jewish Med. Ctr.*, 983 F. Supp. 121, 137 (E.D.N.Y. 1997).  "Indeed, the primary benefit

14   of mergers to the economy is their potential to generate such efficiencies." *Merger Guidelines* ¶

15   4.  Assessment of efficiencies is increasingly common in court decisions involving antitrust

16   challenges to mergers.

17           111.    "In the context of a merger, efficiencies grow out of the ability of the

18   combining firms to 'better utilize existing assets' through integration."  ABA Section of Antitrust

19   Law, *MERGERS AND ACQUISITIONS: UNDERSTANDING THE ANTITRUST ISSUES, 2D ED.* at 175 (2004)

20   (quoting *Merger Guidelines* ¶ 4).  The two types of efficiencies "most commonly recognized in

21   merger analysis are productive efficiencies and innovative efficiencies." *Id.* at 176.  The record

22   in this case establishes, to any appropriate standard of proof, that the purpose and likely effect of

23   the proposed acquisition are to capture very substantial efficiencies of this nature.

24           112.    More specifically, the record shows clearly that Oracle reasonably

25   contemplates that the acquisition will generate substantial cost savings (possibly exceeding $1

26   billion *annually*).  These productive efficiencies derive from the opportunity to combine the

27   duplicative research and development, sales and marketing and general and administrative

28   infrastructures of the two organizations. (Tr. 3468:23-3470:2 (S. Catz)).  Although more than $1

LATHAM&WATKINS LLP

billion in *annual* savings may sound optimistic, even for an upside potential benchmark, the

magnitude of these efficiencies derives from the undisputed fact that EAS is a high-fixed-

cost/low-marginal-cost activity.  By eliminating duplication in fixed costs, Oracle can save very

large amounts of money while continuing to serve, and even improving its ability to serve, the

R&D and support needs of the combined customer base.

113.    These estimated cost savings dwarf by several orders of magnitude even

the outside estimates of total potential anticompetitive harm asserted by Plaintiffs within the

alleged "markets" for "high-function" FMS and HRM software.  (Tr. 4416:9-4418:3 (Teece)).

Thus, with headroom to spare, the cost efficiencies alone dwarf even the maximum range of any

asserted anticompetitive effect.  *A fortiori*, because the effects of the transaction will be

procompetitive, efficiencies of this magnitude amply confirm the numerous other grounds for

rejecting Plaintiffs' Section 7 allegations.

114.    Plaintiffs' efficiencies expert, Professor Zmijewski, criticized the portion

of these efficiencies attributable to the projected cost savings on the grounds that the projections

are not sufficiently "substantiated" or "verified", as the *Merger Guidelines* prescribe, and may

include some costs that will vary with output.  However, because PeopleSoft shifted its 2002

position in favor of a combination to one of implacable opposition to acquisition by Oracle,

Oracle's estimates of specific cost savings necessarily relied on publicly available information,

as well as certain assumptions based upon Oracle's careful assessment of its own knowledge and

experience in the industry.  (Tr. 3480:11-15 (S. Catz)).  To demand more than that would mean

that efficiencies in the form of cost savings could never be shown in unfriendly transactions.

115.    Moreover, Oracle's cost savings projections come with unusually

powerful indicia of credibility.  They were not prepared specifically for this proceeding but were

instead the byproduct of overall financial projections prepared for consideration by Oracle's

board in evaluating the terms of its multi-billion dollar tender offers.  (Tr. 3468:8-3470:25

(Catz)).  Thus, they cannot be dismissed as self-serving.  The sponsor of the cost savings

projections testified under oath that they were "bottoms up" cost-savings projections (unrelated

to the simultaneous "worst case" revenue projections), and there is no basis in the record for

LATHAM&WATKINS

1   doubting the veracity of that testimony.  (Tr. 3491:6-25 (Catz)).  Indeed, Professor Zmijewski

2   testified that he had formed no opinion to the contrary or that the projections were not accurate.

3   (Tr. 4556:6-11; 4580:3-14 (Zmijewski)).  In short, this record establishes that the proposed

4   acquisition is likely to yield substantial cost efficiencies that will be used by Oracle in competing

5   for sales of its products to all future customers, including the large customers with whose welfare

6   the government is concerned.

7       116.    The record also shows substantial opportunities for the second major type

8   of efficiency, innovative efficiencies.  "Innovative efficiencies arise when, for example, merging

9   firms lower costs by eliminating duplicative research and development operations or by

10  combining to expand the benefits of a superior technology."  *MERGERS AND ACQUISITIONS*, *supra*

11  at 176.  At each level of the technology stack in which Oracle competes (and hopes to compete),

12  it is confronted by rivals with resources and scale that dwarf Oracle's – *i.e.*, Microsoft and IBM

13  at the database level (Tr. 3436:3-7 (Catz)); IBM and SAP at the middleware level (Tr. 4143:16-

14  4144:22 (Kutnick)); IBM, Microsoft and SAP at the burgeoning integration level (Tr. 4372:5-12

15  (Teece)); and SAP and Microsoft at the applications level.

16      117.    The record is clear and incontrovertible that the rationale for the proposed

17  acquisition is to enable Oracle to catch up to those larger rivals in terms of both resources and

18  scope so that it can effectively compete with them in the future.  There is uncontroverted

19  testimony from Dr. Teece regarding the "virtuous cycle" that will result from allowing Oracle's

20  R&D costs to be spread over the enlarged customer base created by the acquisition, permitting

21  Oracle to compete more effectively at more levels of the technology stack, enabling it to survive

22  and intensify its expanding area of competition with IBM, Microsoft and SAP.

23      118.    Finally, the record shows that those cost savings and the economies of

24  scope achieved by the transaction are likely to be substantially shared with the very large

25  organizations that the government refers to in its Complaint.  Those organizations are the largest

26  and most sophisticated purchasers of the database software, middleware, integration layer and

27  applications software that Oracle sells and hopes to sell in competition with its much larger

28  rivals.

1    **CONCLUSION**

2         119.    For the reasons stated above, the Court finds that Oracle's proposed

3    acquisition of PeopleSoft is unlikely to adversely affect competition in a line of commerce as

4    required to justify a prohibition under Section 7 of the Clayton Act.

5

6

7    DATED:  July 8, 2004                    Respectfully submitted,

8                                            LATHAM & WATKINS LLP
                                             J. Thomas Rosch
9                                            Gregory P. Lindstrom
                                             Daniel M. Wall
10
                                             ORACLE CORPORATION
11                                           Dorian Daley
                                             Jeffrey S. Ross
12

13
                                             By_____/s/_____
14                                               Daniel M. Wall
                                                 Attorneys for Defendant
15                                               ORACLE CORPORATION

16

17

18

19

20

21

22

23

24

25

26

27   SF\473109.3

28

LATHAM&WATKINS LLP

1

**PROOF OF SERVICE**
United States of America, et al. v. Oracle Corporation
U.S.D.C., Northern District, San Francisco Division, Case No. C 04-0807 VRW

2

3

I am employed in the County of San Francisco, State of California. I am over the age of
18 years and not a party to this action. My business address is Latham & Watkins LLP, 505 Montgomery
Street, Suite 1900, San Francisco, CA 94111-2562.

4

5

**ORACLE CORPORATION'S PROPOSED CONCLUSIONS OF LAW**

6

The following parties were served **electronically** on **July 8, 2004** by simultaneously
efiling the above-referenced document(s) with the United States District Court, Northern District of
California, Case No. 04-CV-0807 VRW:

7

8

| | | |
|---|---|---|
| ➢ | Stephen D. Alexander | alexast@ffhsj.com |
| ➢ | Jason T. Anderson | janderson@carrferrell.com |
| ➢ | Alan Michael Barr | abarr@oag.state.md.us |
| ➢ | Gary Honick | ghonick@oag.state.md.us |
| ➢ | Todd A. Sattler | tsattler@state.nd.us |
| ➢ | John Robert Tennis | jtennis@oag.state.md.us |
| ➢ | Kristen Marie Olsen | kristen.olsen@state.mn.us |
| ➢ | Mark Bernard Tobey | mark.tobey@oag.state.tx.us |
| ➢ | Kyle David Andeer | kyle.andeer@usdoj.gov |
| ➢ | Pamela P. Cole | pam.cole@usdoj.gov |
| ➢ | Chad S. Hummel | chummel@manatt.com |
| ➢ | Theresa K. Hankes | hankes.theresa@dorsey.com |
| ➢ | Hway-Ling Hsu | hhsu@be-law.com |
| ➢ | Robert J. Katerberg | Robert.Katerberg@usdoj.gov |
| ➢ | Andrew Thomas Mortl | amortl@glynnfinley.com |
| ➢ | Jeremy Todd Elman | jelman@fenwick.com |
| ➢ | David M. Lisi | dlisi@fenwick.com |
| ➢ | Conrad John Smucker | conrad.smucker@usdoj.gov |
| ➢ | Emmett C. Stanton | estanton@fenwick.com |
| ➢ | James Clayton Owens | jowens@cgsh.com |
| ➢ | David Jacques Smith | smithdj@arentfox.com |
| ➢ | John Mark Gidley | mgidley@whitecase.com |
| ➢ | Rajeev Kumar Malik | rmalik@whitecase.com |
| ➢ | Jennifer Lynne Edwards | jeedwards@ag.state.oh.us |
| ➢ | Beth Ann Finnerty | bfinnerty@ag.state.oh.us |
| ➢ | Mitchell Lee Gentile | mgentile@ag.state.oh.us |
| ➢ | Jay L. Himes | jay.himes@oag.state.ny.us |
| ➢ | Timothy E. Moran | timothy.moran@ago.state.ma.us |
| ➢ | Gary Leland Reback | greback@carrferrell.com |
| ➢ | Michael J. Bettinger | mikeb@prestongates.com |
| ➢ | Erica L. Craven | elc@lrolaw.com |
| ➢ | Shawn Hanson | shanson@jonesday.com |
| ➢ | Karl Olson | ko@lrolaw.com |
| ➢ | Arturo Esteban Sandoval | asandoval@mwe.com |
| ➢ | Matthew P. Vandall | mvandall@jonesday.com |
| ➢ | William Harrison Wright | whwright@hhlaw.com |
| ➢ | George A. Yukas | gyuhas@Orrick.com |

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1   On **July 9, 2004**, I will serve a true copy of the following document(s) described as:

2   **ORACLE CORPORATION'S PROPOSED CONCLUSIONS OF LAW**

3   to the party listed on the attached service list by **First Class Mail**:

4   ➢   **SEE ATTACHED SERVICE LIST**

5   I declare that I am employed in the office of a member of the Bar of, or permitted to
    practice before, this Court at whose direction the service was made and declare under penalty of perjury
6   that the foregoing is true and correct.

7   Executed on **July 8, 2004**, at San Francisco, California.

8

9                                              /S/
                                      _____
                                              LINDA C. TAM

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**SERVICE LIST**
United States of America, et al. v. Oracle Corporation
U.S.D.C., Northern District, San Francisco Division, Case No. C 04-0807 VRW

Renata B. Hesse, Chief
N. Scott Sacks, Assistant Chief
R. Hewitt Pate, Assistant Attorney General
J. Bruce McDonald, Deputy Assistant, AG
Claude F. Scott, Jr., Trial Attorney
UNITED STATES DEPARTMENT OF JUSTICE
Antitrust Division
Networks & Technology Enforcement Section
Patrick Henry Building
601 D Street, Suite 1200
Washington, DC 20530
Telephone:   (202) 307-6200
Facsimile:     (202) 616-9937

Counsel for Plaintiff *United States of America*

Phillip H. Warren, Chief
Phillip R. Malone, Trial Attorney
UNITED STATES DEPARTMENT OF JUSTICE
Antitrust Division
450 Golden Gate Avenue, Room 10-0101
San Francisco, CA 94102
Telephone:   (415) 436-6660
Facsimile:     (415) 436-6687

Counsel for Plaintiff *United States of America*

Mark J. Bennett, Attorney General
DEPARTMENT OF THE ATTORNEY
   GENERAL
425 Queen Street
Honolulu, HI 96813
Telephone:   (808) 586-1282
Facsimile:     (808) 586-1239

Counsel for Plaintiff *State of Hawaii*

Thomas F. Reilly, Attorney General
Consumer Protection and Antitrust Division
One Ashburton Place
Boston, MA 02108
Telephone:   (617) 727-2200, Ext. 2516
Facsimile:     (617) 727-5765

Counsel for Plaintiff *The Commonwealth of Massachusetts*

Greg Abbott, Attorney General
Barry R. McBee, First Assistant Attorney General
Edward D. Burbach, Deputy Atty General for Lit.
Kim Van Winkle, Assistant Attorney General
OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548
Austin, TX 78711-2548
Telephone:   (512) 463-2185
Facsimile:     (512) 320-0975

Counsel for Plaintiff *State of Texas*

J. Joseph Curran, Jr., Attorney General
Ellen S. Cooper, Assistant Attorney General Chief
OFFICE OF THE ATTORNEY GENERAL
Antitrust Division
200 St. Paul Place, 19th Floor
Baltimore, MD 21202
Telephone:   (410) 576-6470
Facsimile:     (410) 576-7830

Counsel for Plaintiff *State of Maryland*

1  Wayne Stenehjem, Attorney General
   Consumer Protection and Antitrust Division
2  OFFICE OF THE ATTORNEY GENERAL
   600 E. Boulevard Avenue, Dept. 125
3  Bismark, ND  58505-0040
   Telephone:   (701) 328-2811
4  Facsimile:    (701) 328-3535

5

6  Counsel for Plaintiff *State of North Dakota*

7  Michael Cox, Attorney General
8  Paul F. Novak, Assistant Attorney General
   Special Litigation Division
9  MICHIGAN DEPT. OF ATTORNEY GENERAL
   P.O. Box 30212
10 Lansing, MI  48909
   Telephone:        (517) 335-4809
11 Facsimile:         (517) 373-9860

12 Counsel for Plaintiff *State of Michigan*

13

14 Richard Blumenthal, Attorney General
   Steven M. Rutstein, Assistant Attorney General
15 Clare E. Kindall, Assistant Attorney General
   OFFICE OF THE ATTORNEY GENERAL
16 Antitrust Department.
   55 Elm Street
17 Hartford, CT  06106
   Telephone:        (860) 808-5169
18 Facsimile:         (860) 808-5033

19

20 Counsel for Plaintiff *State of Connecticut*

21 SF\472782.1

22

23

24

25

26

27

28

Eliot Spitzer, Attorney General
OFFICE OF THE ATTORNEY GENERAL
   OF NEW YORK
120 Broadway, 26th Floor
New York, NY  10271
Telephone:   (212) 416-8282
Facsimile:    (212) 416-6015

Counsel for Plaintiff *State of New York*

Jim Petro, Attorney General
Antitrust Section
OFFICE OF THE ATTORNEY GENERAL
150 E. Gay Street, 20th Floor
Columbus, OH  43215
Telephone:        (614) 466-4328
Facsimile:         (614) 995-0266

Counsel for Plaintiff *State of Ohio*

LATHAM&WATKINS
ATTORNEYS AT LAW
SAN FRANCISCO

PROOF OF SERVICE
CASE NO. C 04-0807 VRW